**Case No. 20-40869**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

UNITED STATES OF AMERICA,
*Plaintiff - Appellee*

v.

RODNEY MESQUIAS and HENRY MCINNIS
*Defendants - Appellants*

———————————————

On Appeal from the United States District Court
for the Southern District of Texas
No. 1:19-CR-8-1 (Olvera, J.)

———————————————

**BRIEF FOR APPELLANT HENRY MCINNIS**

———————————————

Cooke Kelsey
C. Anderson Parker
PARKER & SANCHEZ, PLLC
700 Louisiana St., Ste. 2700
Houston, Texas 77002
(713) 659-7200
cooke@parkersanchez.us
ATTORNEYS FOR APPELLANT

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Person | Interest
---|---

1. Henry McInnis
   Rodney Mesquias

Appellants

2. Cooke Kelsey
   C. Anderson Parker

Counsel for Appellant
Henry McInnis

3. Hector Canales
   J. A. Canales
   Robert Guerra

Counsel for Appellant
Rodney Mesquias

4. Carmen Castillo Mitchell
   Jeremy Sanders

Counsel for Appellee

/s/ Cooke Kelsey
Cooke Kelsey
ATTORNEY OF RECORD FOR APPELLANT

1

## **REQUEST FOR ORAL ARGUMENT**

This case involves an issue of first impression with broad implications for the hospice industry. The Court's decision on this issue of liability will directly impact the viability of hospice care and could likely impact the availability of hospice to millions of current and future patients. This case could either cause profound instability or safeguard the future of hospice care. Given these real-world impacts and large record totaling over 120,000 documents, counsel believes oral argument would benefit the Court.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..........................................1

REQUEST FOR ORAL ARGUMENT..........................................................2

TABLE OF CONTENTS ........................................................................3

INDEX OF AUTHORITIES ...................................................................3

STATEMENT OF JURISDICTION........................................................5

STATEMENT OF THE ISSUES.............................................................6

STATEMENT OF THE CASE ................................................................7

SUMMARY OF THE ARGUMENT .........................................................8

ARGUMENT.........................................................................................9

   I.  STANDARD OF REVIEW .................................................................9

   II.  ISSUES ON APPEAL ..................................................................10

      A.  The evidence was not sufficient to convict McInnis of Medicare fraud.................................................................................................10

      B.  The district court abused its discretion in sentencing, by extrapolating the loss amount from a few patients to billings for thousands of patients. .......................................................................35

CONCLUSION ....................................................................................38

CERTIFICATE OF SERVICE................................................................39

# INDEX OF AUTHORITIES

## Cases

*Care Alts. v. United States*, 141 S. Ct. 1371 ............................................30

*Deming v. Darling*, 20 N.E. 107, 108 (Mass. 1889).................................30

*Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975).........................12

*Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986).........................................................................................30

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-00604-M, 2016
WL 3449833, at *1 (N.D. Tex. Jun. 20, 2016) ................................ 16, 21

*United States ex rel. Druding v. Druding*, 952 F.3d 89 (3d Cir. N.J.,
Mar. 4, 2020) .......................................................................................... 29

*United States ex rel. Stephenson v. Archer W. Contractors, L.L.C.*, 548 F.
App'x 135 (5th Cir. 2013) ...................................................................... 14

*United States v. AseraCare, Inc.*, 938 F.3d 1278, 1301 (11th Cir. 2019)
.............................................................................................................. 16, 20

*United States v. Ballard*, 322 U.S. 78, 86-88 (1944) ................................ 26

*United States v. Cortez-Gonzalez*, 929 F.3d 200, 203 (5th Cir. 2019) .... 10

*United States v. Cuellar*, 478 F.3d 282, 287 (5th Cir. 2007) (en banc) .. 10

*United States v. Delgado*, 672 F.3d 320, 330 (5th Cir. 2012) (en banc)) 10

*United States v. Fitch*, 137 F.3d 277, 281 (5th Cir. 1998) ...................... 10

*United States v. Ganji,* 880 F.3d 760, 777 (5th Cir. 2018) ...................... 35

*United States v. Myers*, 104 F.3d 76, 78 (5th Cir. 1997) ......................... 10

*United States v. Nora*, 988 F.3d 823, 829-30 (5th Cir. 2021) ................. 34

*United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 681-82 (5th Cir.
2003) ....................................................................................................... 31

*US ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 n.6 (5th
Cir. 2004) ......................................................................................... 13, 29

*US ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262 (5th Cir. 2010)
.............................................................................................................. 13

## **STATEMENT OF JURISDICTION**

This Court has jurisdiction over this appeal under 28 U.S. Code § 1291 and 18 U.S.C. § 3742, because this is an appeal from a final judgment of conviction and sentence.

This appeal is timely under Fed. R. App. P. 4, because the District Court issued a final judgment of conviction and sentence on February 3, 2021 and Appellant McInnis filed his notice of appeal on February 12, 2021. ROA.119696-119697.

## <u>STATEMENT OF THE ISSUES</u>

I.    The Government introduced insufficient evidence to convict a
      non-medical office worker of health care fraud in connection
      with doctors' certifications of patient eligibility for hospice care.
      (Sufficiency of the evidence.)

II.   The district court abused its discretion in determining the loss
      amount by extrapolating from billings for six patients
      specifically chosen by the Government to include all billings for
      thousands of patients. (Sentencing error.)

## STATEMENT OF THE CASE

Merida Health Care Group owned a network of hospice facilities based in South Texas. Appellant McInnis worked as an office employee in Merida's Harlingen office from 2004 to 2018. He earned on average $73,300 over his last 7 years of employment. ROA.51812.

The Government charged McInnis along with his boss Rodney Mesquias and Francisco Pena with an $150 million Medicare fraud conspiracy, based on false certification of hospice patients. ROA.7738.

At trial, the Government offered roughly 100,000 pages of hospice billing records but did not retain an expert to review any patient files or present any expert medical testimony. No evidence was offered that McInnis billed Medicare or certified any patient for hospice care. The District Court denied three motions for acquittal by McInnis, ROA.20-40869.6419-23; ROA.1011–1029; ROA.1145-46, and sentenced McInnis to 15 years in prison. ROA.119703.

## SUMMARY OF THE ARGUMENT

Henry McInnis was an office worker at a hospice chain, Merida Group, that served thousands of elderly patients across South Texas. He was charged with conspiracy to defraud Medicare. The alleged means of the conspiracy consisted of doctors' certifications that hospice patients were likely to die within six months. Yet the law required, and the evidence proved, that such certifications were performed by doctors. McInnis had no ability to question those certifications. At trial, the Government presented the jury a vivid picture of an industry dominated by incomprehensible regulations and perverse incentives, but no evidence that the regulations were broken by McInnis. Lacking testimony on the key factual issue as to the actual life expectancy of the patients, the Government dumped 100,000 pages of raw medical data into the record for the jury to review. No evidence tied McInnis to false or fraudulent certifications as to life expectancy. This case creates a novel form of criminal liability for hospice providers and other industries that provide private services requested by the Government. The Court should reverse.

8

## ARGUMENT

## I.   STANDARD OF REVIEW

The standard of review for issue one is de novo. *United States v. Myers*, 104 F.3d 76, 78 (5th Cir. 1997), *cert. denied*, 520 U.S. 1218. In reviewing the sufficiency of the evidence, the Court asks "whether a rational jury could have found each essential element of the offense beyond a reasonable doubt." *United States v. Delgado*, 672 F.3d 320, 330 (5th Cir. 2012) (en banc)).

The subsidiary issue of liability for false certification of hospice patients as applied to nonmedical staff is a matter of statutory construction that is reviewed de novo. *United States v. Cuellar*, 478 F.3d 282, 287 (5th Cir. 2007) (en banc) (reviewing de novo a sufficiency claim dependent on a question of legal interpretation), *rev'd on other grounds*, 553 U.S. 550 (2008); *United States v. Fitch*, 137 F.3d 277, 281 (5th Cir. 1998).

The standard of review for issue two, regarding the District Court's application of sentencing guidelines, is de novo, and its factual findings are reviewed for clear error. *United States v. Cortez-Gonzalez*, 929 F.3d 200, 203 (5th Cir. 2019).

## II.    ISSUES ON APPEAL

### A. The evidence was not sufficient to convict McInnis of Medicare fraud.

McInnis was an office worker earning roughly $70,000 a year. He was charged with defrauding the Government of $150,000,000 dollars based on false medical certifications. But the Government could not connect McInnis to any actual false certifications.

#### 1.  There was no evidence of direct fraud.

This was not a case of ordinary Medicare fraud, i.e. billing for services that were not performed. The Government did not show any proof of upcoding, altered bills, forgery, phantom patients, or any of the other types of fraudulent activity typically seen in Medicare cases.

#### 2.  There was no evidence of certification fraud.

In lieu of direct fraud, the Government sought to convict McInnis of hospice certification fraud, a type of fraud previously asserted only in the context of civil False Claims Act (FCA) cases.

In its substantive fraud counts, the Government alleged that six patients had not been properly certified for hospice:

10

| Count | Dates of Service | Description of Service | Patient | Medicare Payment |
|:---:|:---:|:---:|:---:|:---:|
| 2 | 8/14/2013 – 10/12/2013 | Hospice Services | J. H. | $2,567.52 |
| 3 | 12/18/2013 – 3/17/2014 | Hospice Services | F. P. | $4,089.52 |
| 4 | 11/6/2013 – 2/3/2014 | Hospice Services | T. C. | $4,304.70 |
| 5 | 6/3/2014 – 8/31/2014 | Hospice Services | A. C. | $4,448.19 |
| 6 | 2/10/2016 – 4/9/2016 | Hospice Services | P. C. | $3,202.85 |
| 7 | 12/23/2014 – 3/22/2015 | Hospice Services | J. C. | $1,282.61 |

None of the dates, names, amounts, or descriptions of these hospice services were alleged to be false. Rather, the Government argued that the patients had not been properly certified in the beginning as eligible for hospice services.

In previous cases involving fraudulent certification under the False Claims Act, courts have distinguished two fact patterns: express and implied false certification. Express certification is stating on a bill that services complied with specified requirements. *E.g. Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (certification on Medicare Form 1490 that claim complied with Medicare Part B rule: "A physician's signature certifies that physician's services were personally rendered by him or under his personal direction."); *US ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 n.6 (5th Cir. 2004)

11

(certification on Medicare Form 1500 that "the services shown on this form were medically indicated and necessary for the health of the patient" as required by 42 U.S.C. § 1395). Implied false certification, by contrast, is a novel and controversial type of claim based on the legal fiction that by sending a bill to the government one is deemed after-the-fact to have made fraudulent certifications as to esoteric regulations, such as Medicare coding rules. This Court has repeatedly criticized the concept of implied certification, which elides the "crucial distinction between punitive FCA liability and ordinary breaches of contracts." *US ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262 (5th Cir. 2010).

### a. Express certification fraud.

In the indictment, the Government alleged that McInnis had conspired in express certification fraud, submitting claims that certified that "(a) the contents of the form were true, correct and complete; (b) the form was prepared in compliance with the laws and regulations governing Medicare; and (c) the services being billed were medically necessary." ROA.7733.

At trial, however, the Government produced no evidence that McInnis submitted any claim or that anyone made such a certification.

12

Furthermore, certification of compliance with every law governing

Medicare would be overbroad and unenforceable. *See United States ex*

*rel. Stephenson v. Archer W. Contractors, L.L.C.*, 548 F. App'x 135 (5th

Cir. 2013) (overbroad certification as to compliance with laws

unenforceable).

### b. Implied certification fraud.

At trial, the Government resorted to its novel theory of implied

false certification, arguing that McInnis had falsely and implicitly

certified that Merida's patients had previously been certified as eligible

for hospice by doctors. No evidence, however, supported this convoluted

theory.

### (i) Hospice doctors properly certified patients as eligible for hospice.

McInnis was not a doctor and never purported to certify patients

as eligible for hospice. Medicare rules provide that certification of

patients as eligible for hospice can only be performed by doctors.

> Certification will be based on the *physician's or medical director's clinical judgment*. . . . The certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course. . . . The *physician* must include a brief narrative explanation. . . . All certifications and recertifications must be signed and dated by the *physician(s).*

42 C.F.R. § 418.22(b) (emphasis added).

Evidence at trial showed each of the six patients was properly certified by the patient's primary care physician, hospitals and other medical providers. ROA.37234, ROA.37259-62; ROA.5347-48; ROA.22213; ROA.15644; ROA.15872; ROA.25978; ROA.29321; ROA.1599.

### (ii) Doctors' certifications were not controverted by competent evidence.

Faced with medical records supporting each certification and claim for reimbursement, the Government chose not to offer expert medical testimony to controvert these doctors' certifications. The Government then de-designated its potential medical expert and offered roughly 100,000 pages of raw medical data into the record without explanation.

Courts have rejected similar untethered hospice certification claims in False Claims Act suits, applying a lower mens rea requirement and burden of proof, concluding that plaintiffs must at minimum controvert the alleged false medical certifications with "an objectively verifiable fact at odds with the exercise of that judgment."

14

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, No. 3:07-cv-00604-M, 2016 WL 3449833, at *1 (N.D. Tex. Jun. 20, 2016); *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1301 (11th Cir. 2019). In *Wall*, Chief Judge Lynn of the Northern District thoroughly analyzed a sprawling hospice fraud cause including voluminous medical and statistical reports, ultimately determining that the following evidence was legally insufficient to establish fraudulent implied certification of hospice patients:

- Expert testimony from a hospice physician, "summarizing his review of 291 patient files and conclusion that a large percentage of those patients were not eligible." 2016 U.S. Dist. LEXIS 80160, at *15.

- Expert testimony from a statistician extrapolating from the 291 sample to several thousand false claims. *Id.*

- Lay testimony of employees "that they falsified patient records when instructed to do so by Defendants' supervisors, and that doctors relied on those false records to certify patients as eligible"; "that supervisors in the Montgomery office were rewarded with bonuses for admitting patients"; "physicians certifying patients without reviewing patient files"; "a culture of admitting and maintaining patients who were ineligible for hospice"; "live discharge process in place that gives the patient two and often three or four reviews"; Care Process Guidelines and Eligibility Worksheets with mandatory language to use in evaluations to fraudulently "assist in supporting eligibility." *Id.* at 25.

Judge Lynn held that even if the hospice's "aggressive marketing and enrollment policies were ill-advised," the core principle of the Medicare hospice benefit remained: "eligibility depends on physician judgment." *Id.* at 62. Neither lay observations of patient health nor expert statistical analyses of cold medical records could render such clinical judgments fraudulent en masse. *Id.*

The Government's proof in this criminal fraud case, by contrast, consisted of no more than lay testimony of cooperating witnesses and a Medicare contractor offering unqualified opinions as to the percentage of false certifications, summarily second-guessing thousands of individual medical records and prognoses by roughly 15 certifying doctors who were never alleged of wrongdoing or questioned at trial. No competent evidence was offered to controvert the certifications.

### (iii) Doctors' certifications were "supported" and did not lack required documentation.

The Government argued in the alternative that McInnis committed fraud by billing Medicare without sufficient supporting paperwork. In pursuing this argument, the Government seeks to impose vast new recordkeeping requirements on hospice providers, which Congress and the CMS have explicitly chosen not to require.

The Government presented an employee of a Medicare contractor designated as an "expert on Medicare's rules regarding the home health and hospice programs," Laura McMillan. McMillan had never been qualified to give such testimony. She pronounced that Merida's claims did not comply with Medicare rules because "the documentation did not support that those patients met coverage guidelines" as set forth in an internal guideline for claims processors called a Local Coverage Determination (LCD). McMillan was asked what specific documentation was required, and she replied "specific clinical documentation" for all illnesses suffered by the patient:

> Oftentimes, patients who have terminal illnesses have other conditions that are also affecting the outcome of that patient. Not only do they have other illnesses, they have, what we call, secondary conditions. **Certifications for terminal illness require sufficient documentation on all those conditions.**

This erroneous testimony, on which the Government relied throughout trial, presumes that hospice providers must maintain unlimited records regarding not only the terminal illness but all illnesses suffered by hospice patients.

The sole documentation required by the Medicare rules for hospice certification is a sheet of paper containing a signed certification stating

17

that (1) "the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course" and (2) a "brief narrative explanation of the clinical findings that supports a life expectancy of 6 months." 42 C.F.R. § 418.22(b)(3). The suggested sample narrative provided by CMS is 5 sentences.[1] Although the preceding subsection states that "clinical information and other documentation that support the medical prognosis must accompany the certification," 42 C.F.R. § 418.22(b)(2), the narrative can satisfy that provision. Doctors simply need to keep whatever clinical documentation they find relevant to the prognosis in the medical record. Importantly, there is no minimum requirement for documentation beyond the brief narrative. As the Eleventh Circuit has explained, "supporting" documentation does not mean "sufficient" to meet any criteria or standard:

> Congress said nothing to indicate that the medical documentation presented with a claim must prove the veracity of the clinical judgment on an after-the-fact review. And CMS's own choice of the word "support"— instead of, for example, "demonstrate" or "prove"—does not imply the level of certitude the Government wishes to attribute to it.

---

[1] *See* https://www.cms.gov/outreach-and-education/medicare-learning-network-mln/mlnmattersarticles/downloads/se1628.pdf.

*AseraCare*, 938 F.3d at 1290. The rules thus give providers wide latitude in interpreting the minimal documentary requirement for certifications. Even those minimal requirements are widely disregarded; CMS reports that for 10% of hospice stays, certifying doctors fail to provide a narrative at all.[2]

CMS did at one time propose requiring clinical documentation and establishing objective criteria, but Congress flatly preempted this proposal and amended the Medicare Act in 2000 to state: "the certification regarding terminal illness . . . shall be based on the physician's or medical director's clinical judgment." H.R. 4577, 114 Stat. 2763 (2000). Accordingly, CMS rules now provide that hospice certifications are based on the doctor's "subjective . . . medical findings." 42 C.F.R. § 418.102. CMS has since repeatedly affirmed that no specific documentation is required. 70 Fed. Reg. 70,532, 70,535 (Nov. 22, 2005) ("We are removing the word 'specific' and changing 'findings' to

---

[2] Suzanne Murrin, Hospices Should Improve Their Election Statements and Certifications of Terminal Illness, U.S. Dep't of Health & Human Servs. Office of Inspector Gen. (Sept. 2016), https://oig.hhs.gov/oei/reports/oei-02-10-00492.pdf; Medicare Hospice Care for Beneficiaries in Nursing Facilities: Compliance with Medicare Coverage Requirements (OEI-02-06-00221; 09/09) (hhs.gov); National Association for Home Care & Hospice, Hospice-Performance-On-Health-And-Safety-Surveys-Concerns-Recommendations.pdf (2020).

'information'"); 73 Fed. Reg. 32,088 (June 5, 2008) ("We have removed the term 'criteria' in order to remove any implication that there are specific CMS clinical benchmarks in this rule that must be met in order to certify terminal illness."). The rules for certification of terminal illness simply "do not provide objective standards or criteria to cabin such determinations." *Wall*, 2016 WL 3449833, at \*62.

Despite the above voluminous guidance from Congress and the CMS that no additional documentation is required, the Government has repeatedly asserted in fraud cases that the Local Coverage Determination: Hospice Determining Terminal Status is a relevant standard for certification of hospice patients. The LCD is a document published by private claims contractors to determine whether hospice services are covered by Medicare.[3] It has no medical validity or legal relevance in certification cases. The Government expert's testimony on noncompliance with LCD's was error. *See Wall*, 2016 WL 3449833, at \*60 n.n.134, 138 (expert's description of LCDs was "rife with errors"); *AseraCare*, 938 F.3d at 1288 (approving limiting instruction that "the

---

[3] *See* 42 U.S.C. § 1395y(a)(1)(C) (hospice benefit limited to reasonable and necessary services) & (l)(6)(B) (coverage defined by LCD).

jury was not permitted to conclude that Dr. Liao's testimony was more credible because he made reference to the LCD criteria, or that AseraCare's claims were false if they failed to conform to those criteria").

In recent years, CMS has steadily moved toward disavowing the LCD entirely as a prognosis tool, after a controversial proposal in 2010 that would have required certifications to include evidence from three categories of criteria listed in the hospice LCDs (L13653, L25678, L29881). 75 Fed. Reg. 70,371 (Nov. 17, 2010). After public outcry and claims that the proposal constituted an unlawful delegation of legislative power, CMS retracted the suggestion, citing Congress's Statutory Clarification of 2000: "The illustrative clinical findings mentioned above are not mandatory national policy. We reiterate that certification or recertification is based upon a physician's clinical judgment, and is not an exact science." 76 Fed. Reg. 26,806 (May 9, 2011).

To date, the LCDs have never been validated and have been
discredited by the medical community as a tool for prognosis.[4] But
because reimbursement is based on the LCDs, hospices have "rigidly
adhered to LCDs as a 'standard,' . . . fearful of regulatory retribution
against their medical licensure, refusing to certify patients for hospice
care unless every LCD box could be checked."[5] Their use in FCA suits
and fraud prosecutions such as this one has unfortunately created a
vicious circle resulting in a "skewed distribution of hospice admissions,
with most patients dying within days to weeks (rather than weeks to
months), and a smaller fraction of seemingly similar patients at the
time of referral and admission living well beyond 6 months."[6] CMS has
so far declined to adopt or even to fund research into a medically valid
standard for estimating 6-month life expectancy." [7] The "science of

---

[4] Moore, D Helen, "Evaluation of the Prognostic Criteria for Medicare Hospice
Eligibility" (2004), https://scholarcommons.usf.edu/etd/1167; Fine, P. G. "Hospice
Underutilization in the US: The Misalignment of Regulatory Policy and Clinical
Reality." Journal of Pain and Symptom Management 56.5 (2018): 808-815.

[5] Fine, P. G. "Hospice Underutilization in the US: The Misalignment of Regulatory
Policy and Clinical Reality." Journal of Pain and Symptom Management 56.5
(2018): 808-815.

[6] *Id.*

[7] E.g. 2020 Regulatory Blueprint for Action, National Association for Home Care &
Hospice, https://www.nahc.org/wp-content/uploads/2020/12/2020-Regulatory-
Blueprint.pdf ("Criteria for determining a prognosis of six months or less (eligibility

prognostication is in its infancy. . . . There are no empirically validated
predictors of life expectancy beyond an experienced physician's clinical
judgment."[8] In practice, hospice physicians resort to rules of thumb, e.g.
"the 'surprise' question, 'Would I be surprised if this patient died in the
next year?'"[9]

Given the total absence of objective and generally accepted
certification standards, asking a lay jury to determine whether
certifying doctors' subjective judgments were false or fraudulent based
on lay testimony or even post hoc medical reviews is inappropriate. As
one commentator put it, "It is difficult to conceive of a greater abuse of
discretion than seeking to enforce compliance of the . . . coverage
criteria before even defining and notifying providers of the parameters

---

for hospice services) is not a matter to be decided at the local level, but rather by a
set of scientifically determined variables, signs, and symptoms for discrete
diagnoses based on research and clinical judgment.").

[8] Fine, P. G. "Hospice Underutilization in the US: The Misalignment of Regulatory
Policy and Clinical Reality." Journal of Pain and Symptom Management 56.5
(2018): 808-815; Rector T, Taylor BC, Sultan S, Shaukat A, Adabag S, Nelson D,
Capecchi T, MacDonald R, Greer, N, Wilt TJ. Life Expectancy Calculators, VA ESP
Project #09-009 (2016) ("We found no true external validation studies of the
reviewed mortality prediction models. None of the models have been externally
validated for general primary care use.").

[9] Martin, Emily J.; Widera, Eric, Prognostication in Serious Illness. Medical Clinics
of North America (2020); Vasista, A; Stockler, MR; Martin, A; Lawrence, NJ; Kiely,
BE, Communicating prognostic information: what do oncologists think patients with
incurable cancer should be told?. Internal Medicine Journal (2020).

and interpretations to be imposed."[10] Imposing criminal fraud liability for lax recordkeeping regarding certifications would be even more unfair, given the widespread confusion even among CMS's own contractors about what documentation is actually required.

### ii. The First Amendment delimits prosecution of fraudulent hospice certification claims.

Having granted hospice doctors unfettered discretion to exercise clinical judgment in determining hospice eligibility, the Government may not dictate the content of those judgments. In *United States v. Caronia*, 703 F.3d 149, 169 (2d Cir. 2012), the court held the First Amendment barred prosecution of pharmaceutical salesmen for alleged fraudulent off-label "misbranding" where off-label use was otherwise permitted. The court concluded: "The government cannot use a criminal conspiracy charge as a subterfuge to circumvent statutes and FDA regulations, and to justify imposing criminal liability for speech the governing law permits."

---

[10] Timothy Blanchard, *Symposium: Medicare Medical Necessity Determinations Revisited: Abuse Of Discretion And Abuse Of Process In The War Against Medicare Fraud And Abuse*, 43 St. Louis L.J. 91, 120-121 (1999).

End-of-life discussions warrant additional protection under the Free Expression Clause. Hospice regulations directly involve religious expression, requiring hospices to designate a "pastoral or other counselor" to care for hospice patients. 42 C.F.R. §§ 418.56(a); 418.3; 418.54(c)(7); 418.66(d)(1); 488.110. Spiritual counseling is made available as a "core hospice service." 42 C.F.R. §§ 418.64(d)(3).

The Supreme Court has long held that the First Amendment precludes the use of fraud statutes in the context of end-of-life spiritual counseling. *See United States v. Ballard*, 322 U.S. 78, 86-88 (1944) (prosecution for false claims made to terminally ill patients about incurable diseases was unconstitutional). The Court characterized such prosecution as direct threat to religious expression: "The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom." *Id.*

In this context of the Medicare Hospice Benefit, Congress has appropriately provided broad leeway for doctors to determine life expectancy according to "subjective" findings, 42 C.F.R. § 418.102, and

to coordinate discussion of those findings with chaplains and counselors according to each patient's "physical, psychosocial, emotional, and spiritual needs." 42 C.F.R. § 418.54(c). A driving reason for this flexible policy is the vast disparity in utilization of hospice services among religious and racial groups, generally attributed to the secular and nihilistic manner in which prognoses are discussed by the medical community.[11] Even the term "hospice," for instance, has a negative connotation for Spanish speakers, meaning a place for orphaned children.

Nonetheless, at trial in this case the Government broadly attacked the use of chaplains to facilitate care across Merida's patient population in South Texas, arguing variously that chaplains were giving patients false hope or false fear: "Counseling them on God's plan for death. It wasn't their time to die.  Some patients were being deceived that they didn't have to die to be on hospice; other patients were being deceived that they were dying when they weren't." ROA.6772. Needless to say

---

[11] NAHC, 2020 Regulatory Blueprint for Action; Robert Bulanda, Note, A Step Toward Normalizing End-of-Life Care: Implications of the Palliative Care and Hospice Education and Training Act (PCHETA), 39 N. Ill. U. L. Rev. 330 (2019).

these arguments were all based on hearsay about unrecorded private conversations between chaplains and hospice patients.

The Government should not dictate much less criminalize the manner in which doctors express subjective clinical judgments regarding a patient's life expectancy or the content of end-of-life discussions between chaplains and patients.

### iii. The judgment threatens broad disruption to the hospice industry.

The hospice industry consists of thousands of small businesses serving millions of patients, subject to ever-changing requirements of a single government payor. To obtain reimbursement, hospices must comply with 300 elements of compliance with Medicare rules.[12] The one thing they can rely on is the doctor's clinical judgment: "CMS has considered and expressly declined to impose defined criteria that would govern the physician's exercise of judgment." *AseraCare, Inc.*, 938 F.3d at 1301.

Imposing criminal liability based on doctors' false, or optimistic or pessimistic, subjective judgments as to life expectancy will cause

---

[12] NAHC, Hospice Performance On Health And Safety Surveys Concerns Recommendations (2019).

profound instability in the hospice industry. Before this case, such a

threat had only been contemplated in the context of the False Claims

Act. The Eleventh Circuit concluded this was not the proper role of the

judiciary:

> Congress and CMS could have imposed a more rigid set of
> criteria for eligibility determinations that would have
> minimized the role of clinical judgment. Instead, they were
> careful to place the physician's clinical judgment at the
> center of the inquiry. . . . In any event, the FCA is an
> inappropriate instrument to serve as the Government's
> primary line of defense against questionable claims for
> reimbursement of hospice benefits.

*AseraCare, Inc.*, 938 F.3d at 1301. A circuit split has since arisen, as a

result of a broadly criticized holding by the Third Circuit that doctor's

certifications of terminal illness may constitute false claims under the

False Claims Act in certain circumstances. *United States ex rel.*

*Druding v. Druding*, 952 F.3d 89 (3d Cir. N.J., Mar. 4, 2020). In

reaching this holding, Third Circuit abandoned a near universal

consensus that opinions and judgments regarding complex technical or

legal issues are not actionable as fraud. *See United States ex rel. Riley v.*

*St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376-77 (5th Cir. 2004) ("We

agree in principle with the district court and accept that the FCA

requires a statement known to be false, which means a lie is actionable

but not an error."); *Presidio Enters., Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986) ("Actions for fraud or misrepresentation must be based on objective statements of fact."); *Deming v. Darling*, 20 N.E. 107, 108 (Mass. 1889) (Holmes, J.) (statements "open to difference of opinion" are not actionable as fraud).

Requiring hospices to force doctors to go above and beyond the rules Congress has established to certify hospice patients would be oppressive and burdensome. A broad coalition of industries filed amicus briefs in *Druding* portraying exactly what will happen in this circuit should the Court affirm. The brunt will fall on the hospice industry:

> Fearing retrospective second-guessing of their clinical judgment, physicians may be reluctant to certify a patient as terminally ill unless the patient is nearly certain to die within six months. Other physicians, in turn, may hesitate to refer potential patients to hospice. By threatening to limit the availability of the Medicare hospice benefit, the decision could deprive millions of terminally ill individuals and their families of hospice care's undisputed benefits.

Brief for the American Medical Association, National Hospice and Palliative Care Organization, National Association for Home Care & Hospice, American Academy of Hospice and Palliative Medicine, *Care Alts. v. United States*, 141 S. Ct. 1371 (cert denied, Feb. 22,

2021). The U.S. Chamber of Commerce further explained that the

issue of fraud liability for hospice certifications

> has implications far beyond the hospice context. It
> potentially affects any entity, public or private, that receives
> federal funds in myriad contexts: government contractors
> working under cost-reimbursement contracts; medical
> providers delivering services based on their good-faith
> medical judgments; researchers submitting claims for grant
> funds based on their scientific opinions; and any business
> attempting to navigate the complex statutory, regulatory, or
> contractual regime that governs their receipt of government
> funds.

141 S. Ct. 1371, Brief of the U.S. Chamber of Commerce.

The Healthcare Fraud Act, even more so than the civil FCA, "is

not an appropriate vehicle for policing technical compliance with

administrative regulations." *United States v. Southland Mgmt. Corp.*,

326 F.3d 669, 681-82 (5th Cir. 2003) (en banc) (Jones, et al. concurring).

"Where disputed legal issues arise from vague provisions or regulations,

a contractor's decision to take advantage of a position can not result in

his filing a 'knowingly' false claim."

The Department of Health and Human Services already has an

array of enforcement tools beyond simply denial of coverage for

ineligible hospice patients, including civil monetary penalties and the

authority to exclude individuals and hospice companies. *See, e.g.*, HHS,

Civil Monetary Penalty Authorities,

https://oig.hhs.gov/fraud/enforcement/civil-monetary-penalty-

authorities/ (last visited July 27, 2021) (listing 25 separate statutory

authorities for civil monetary penalties). The department makes broad

use of these remedies which Congress intended to be used to combat

noncompliance with hospice regulations. Prosecuting hospice eligibility

determinations as fraud would undermine this statutory regime and

create broad regulatory uncertainty for the health care industry.

### iv.  McInnis did not willfully falsify certifications for six, much less 10,000, hospice patients.

The principle error in the judgment below is the evidentiary gap

between the scope of the alleged conspiracy, consisting of allegedly

fraudulent certifications signed by 15 doctors for thousands of patients,

and the Government's evidence consisting of lay testimony regarding

instances of lax recordkeeping or other alleged improper business

practices.

McInnis was a back-office administrator with a high-school

education. He had no training or experience in clinical diagnosis or

prognosis, nor in Medicare billing practices and regulations. He had no

ownership or official authority to manage the clinics. He earned

approximately $70,000 per year. And as a nonmedical employee, he had no choice but to rely on certifications by doctors and to facilitate recruitment of patients and doctors, although he personally did not do any such recruitment. His interactions with doctors were limited to office tasks like answering the phone and scheduling appointments.

The Government suggested throughout trial that Merida's business model of recruiting noncancerous hospice patients was illegal or immoral, and yet it is a business model that the Government created. Medicare pays an arbitrary per diem rate of $199 per patient. For-profit hospices universally, openly, and aggressively recruit longer-living patients, in particular noncancerous dementia patients who frequently survive longer than a year due to the uncertainty and regulatory leeway for dementia prognoses.[13] McInnis's role as a participant in this government-run market cannot make him liable for defrauding the Government.

To prove that McInnis willfully submitted a claim based on a false hospice certification, a determination that is "inherently subjective,

---

[13] National Association for Home Care & Hospice, Facts-Figures-2020-edition.pdf; MedPac, Report to the Congress: Medicare Payment Policy (March 2021).

patient-specific, and dependent on the judgment of involved physicians,"

the Government must have proven at minimum that each certification

was not simply wrong but obviously and objectively false. *Wall*, 2016

U.S. Dist. LEXIS 80160, at \*35. Yet at trial, no witness was competent

to controvert the fact that each patient was properly certified by a

medical doctor.

　　In *United States v. Nora*, 988 F.3d 823, 829-30 (5th Cir. 2021), this

Court recently addressed the same evidentiary gap in a Medicare fraud

case against an office manager whose primary job responsibilities were

to process allegedly fraudulent patient certifications. His duties

included:

- "keep[ing] up with the electronic data filing system, including preparing admit and re-certification paperwork for the field nurses"
- "entering the field nurse's certifications into the system"
- "correcting clerical errors before admission documents and plans of care were sent to physicians"
- receiving referral calls, taking in initial demographic information, and routing the calls to the case managers or the Director of Nursing for a clinical evaluation"
- "scheduling the home visits by nurses"

*Id.* Like McInnis, Nora was a salaried employee who received no profits

from the alleged multi-million-dollar scheme. Although the Government

put on lay testimony suggesting that Nora knew that "homebound"

33

patients were not actually homebound, including a patient who was known to go to beauty appointments, shop for groceries, and visit family members, this Court found that Nora had no obligation to question the patient's "medical necessity or homebound status" as certified by a medical doctor. *Id.*

Similarly, in *United States v. Ganji,* 880 F.3d 760, 777 (5th Cir. 2018), the Government charged a home health care company and doctor with fraudulently certifying hundreds of patients as "homebound" and defrauding Medicare of $30,000,000. Patient doctors testified that they were not actually homebound. Yet the Government failed to show the certifying doctor, much less the business owner, knew the patients were ineligible. The Court concluded: "The Government presented evidence of Dr. Ganji's participation in lax practices. However, Dr. Ganji was not convicted of patient negligence, keeping subpar files, or haphazardly conducting her business." *Id.* at 778.

### v. Conclusion

The judgment against McInnis rested entirely on the Government's theory of fraudulent billing for ineligible hospice patients:

- Six substantive counts of Medicare fraud (Counts 2-7);

34

- Three counts predicated on fraud: conspiracy to commit Medicare fraud (Count 1), conspiracy to launder proceeds of Medicare fraud (Count 8); and conspiracy to produce false records of Medicare claims (Count 11).

There is an evidentiary gap between the purportedly false claims and McInnis's role in the company. The evidence showed the six patients listed in Counts 2-7 were referred, certified, and recertified as eligible by medical doctors. McInnis did not certify or falsify any Medicare claims.

Holding McInnis liable for false certification under these facts would create a novel basis for criminal liability for health care companies seeking to comply with facially inconsistent reporting requirements. It would also create criminal liability for employees at every level in the health care industry, no matter what role they have. Finally, it would amount to an aggressive intrusion by the Government into the most sensitive area of patient care in violation of the First Amendment. End-of-life discussions should not be regulated, dictated or criminalized by the Government.

## B. The district court abused its discretion in sentencing, by extrapolating the loss amount from a few patients to billings for thousands of patients.

35

Over Appellant's objection the court adopted the PSR including a 24-level enhancement for loss greater than $65,000,000 and a corresponding 4-level enhancement for health care fraud involving loss greater than $20,000,000. ROA 119803. The government bears the burden of establishing the loss by a preponderance of the evidence, and the district court must make factual findings sufficient to support the attributed amount. *United States v. Villa*, 589 F. App'x 532 (11th Cir. 2015). It is a fact-specific, case-by-case inquiry into the defendant's intent in determining intended loss for sentencing purposes. *United States v. Isiwele*, 635 F.3d196, 203 (5th Cir. 2011).

At trial, the Government entered more than 100,000 pages of raw medical and billing data into the record, corresponding to $125 million in payments to nine distinct providers over a nine-year period (2009 to 2018). Without any expert testimony or analysis that would permit the jury and the court to extrapolate the number of claims reasonably corresponding to claims for the six patients in Count 2 – 7, the court simply assumed it was hopeless and calculated the loss amount based on all billings, more than doubling McInnis's guideline score. The Government itself denied that all the billings were fraudulent. ROA

36

1615-16 ("Now to be clear, ladies and gentlemen, no one during this trial is going to take that stand and tell you that every single claim that the Merida Group submitted contained false information. No one is going to say that."). The Government attempted to use cooperating witnesses to broadly testify about marketing and patient recruitment, but none could testify on whether the patient certifications were actually false or fraudulent. Both the prosecution and court below repeatedly invoked the $150,000,000 in submitted Medicare claims. However, the amount billed or paid alone is insufficient evidence to determine the loss amount. *See Wall*, 2016 WL 3449833, at \*25 (discussion of statistical analysis need to prove falsity in a hospice case). The court below itself seemed to question the actual loss amount attributable to McInnis by only imposing a money judgment of $197,088.00 on McInnis himself. ROA.119694.

It was not disputed that all of the services that were billed were performed; at most there was overtreatment. At worst, sick and elderly patients received more visits from nurses and chaplains than they otherwise would have and these patients outlived their projected six-

37

month death certifications. That is not a crime and it is not a basis for calculating actual loss.

Accordingly, a 4-level enhancement under USSG 2B.1.1(b)(1)(C) >$15k - <$40k is the maximum amount of loss supported by the record.

## CONCLUSION

This Court should reverse and acquit  Appellant Henry McInnis, or in the alternative remand for sentencing consistent with the amounts proven to be fraudulent by the jury in counts 2 – 7, if any.

Respectfully submitted,

/s/ Cooke Kelsey
Cooke Kelsey
M. Andres Sanchez-Ross
PARKER & SANCHEZ, PLLC
700 Louisiana St., Ste. 2700
Houston, Texas 77002
 (713) 659-7200

## CERTIFICATE OF SERVICE

I certify that today, August 13, 2021, the foregoing document was served, via the Court's CM/ECF Document Filing System, upon the following registered CM/ECF users:

Carmen Castillo Mitchell, Assistant U.S. Attorney
Jeremy Sanders, Assistant U.S. Attorney

/s/ Cooke Kelsey
Cooke Kelsey

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this document contains 6,899 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type-style requirements of Fed. R. App. P. 32(a)(6), and 5th Cir. R. 32.2, because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Century Schoolbook 14-point font in text and Century Schoolbook 12-point font in footnotes.

3. This brief and the record excerpts were filed electronically, in native Portable Document File (PDF) format, via the Fifth Circuit's CM/ECF system.

/s/ Cooke Kelsey
Cooke Kelsey