No. 20-40869

# In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

**RODNEY MESQUIAS**
and **HENRY McINNIS,**

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, D. CT. NO. 1:18-CR-8 (HON. ROLANDO OLVERA)

## CONSOLIDATED APPELLEE'S BRIEF FOR THE UNITED STATES

JENNIFER B. LOWERY
  Acting United States Attorney

CARMEN CASTILLO MITCHELL
  Chief, Appellate Division
  Southern District of Texas

JEREMY R. SANDERS
  Appellate Counsel, Fraud Section

KENNETH A. POLITE, JR.
  Assistant Attorney General

LISA H. MILLER
  Acting Deputy Assistant Attorney General

JOSHUA K. HANDELL
  Attorney, Appellate Section
  Criminal Division, Ste. 1515
  United States Department of Justice
  950 Pennsylvania Avenue N.W.
  Washington, DC 20530
  (202) 305-4244
  joshua.handell@usdoj.gov

# CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1. Kenneth A. Polite, Jr.—Assistant Attorney General

2. Lisa H. Miller—Acting Deputy Assistant Attorney General

3. Joshua K. Handell—Attorney, Appellate Section, Criminal Division

4. Jeremy R. Sanders—Appellate Counsel, Fraud Section, Criminal Division

5. Jennifer B. Lowery—Acting United States Attorney for the Southern District of Texas

6. Carmen Castillo Mitchell—Chief, Appellate Division, United States Attorney's Office for the Southern District of Texas

7. Rodney Mesquias—Defendant-Appellant

8. Hector Antonio Canales—Counsel for Defendant-Appellant Mesquias

9. Jose Antonio Canales— Counsel for Defendant-Appellant Mesquias

10. Robert Louis Guerra Jr.— Counsel for Defendant-Appellant Mesquias

11. Henry McInnis—Defendant-Appellant

12. Cooke Kelsey—Counsel for Defendant-Appellant McInnis

13. C. Anderson Parker—Counsel for Defendant-Appellant McInnis

14. Hon. Rolando Olvera—Judge of the United States District Court for the Southern District of Texas

*s/Joshua K. Handell*
JOSHUA K. HANDELL
   Lead Counsel for the United States

## STATEMENT REGARDING ORAL ARGUMENT

The government disagrees with the defendants' contention that this appeal raises legal questions of first impression in this Circuit.[1] *See* Mesquias Br. iii; McInnis Br. 2. However, in light of the length and complexity of the trial record and the seriousness of the offenses of conviction, the government does not oppose the defendants' request for oral argument.

---

[1] When necessary to distinguish either their arguments or their conduct, this brief refers to each defendant by his last name. When discussing Mesquias and McInnis collectively, this brief uses "the defendants."

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................ i

STATEMENT REGARDING ORAL ARGUMENT .................................................... ii

TABLE OF CONTENTS .......................................................................................... iii

TABLE OF AUTHORITIES ...................................................................................... vi

INTRODUCTION ...................................................................................................... 1

STATEMENT OF JURISDICTION ........................................................................... 2

STATEMENT OF THE ISSUES ................................................................................ 2

STATEMENT OF THE CASE ................................................................................... 2

    I.    Procedural History ..................................................................................... 2

    II.    Statement of Facts ..................................................................................... 4

        A.    Medicare's Hospice and Home-Health Benefits ............................. 4

        B.    The Merida Group's Medicare Fraud ............................................... 6

            1.    The Vast Majority of the Merida Group's Patients Did
                 Not Qualify for Hospice or Home-Health Services. ........... 6

            2.    The Merida Group Bribed Medical Directors to
                 Rubberstamp Unqualified Patients for Services. ................. 8

            3.    Merida Group Employees Routinely Fabricated and
                 Falsified Medical Records to Perpetuate the Fraud. .......... 11

            4.    Non-Terminal Patients Were Deceived into Enrolling
                 in Hospice. .......................................................................... 13

        C.    The Defendants' Roles in the Merida Group's Fraud ................... 14

            1.    As Owner and Head of the Merida Group, Mesquias
                 Masterminded the Conspiracy. ........................................... 14

2.     As Mesquias's Right-Hand Man, McInnis Enforced the Policies and Practices that Sustained the Conspiracy. .................................................................. 19

III.   Rulings Under Review ................................................................ 24

SUMMARY OF ARGUMENT ................................................................ 25

ARGUMENT ................................................................................................ 27

I.   Sufficient Evidence Supported the Jury's Verdicts. ................... 27

A.   Background ............................................................................. 27

B.   Standard of Review .............................................................. 27

C.   Ample Trial Evidence Established the Defendants' Culpability for Committing Healthcare Fraud. ............... 28

1.   Count 2—J.H. ............................................................ 28

2.   Count 3—F.P. ............................................................ 30

3.   Count 4—T.C. ........................................................... 33

4.   Count 5—A.C. ........................................................... 35

5.   Count 6—P.C. ........................................................... 37

6.   Count 7—J.C. ........................................................... 39

D.   The Defendants' Contention that They Cannot Be Convicted on the Basis of Opinions as to Benefit Eligibility Both Misrepresents the Record and Misapprehends the Law. ....................................................................................... 40

1.   The Trial Evidence Established that the Merida Group's Medicare Claims Did Not Truthfully Reflect the Certifying Physicians' Clinical Judgment. ................... 40

2.   The Defendants' Cited Case Law Does Not Undermine the Jury's Falsity Determination. ................. 46

3.      Expert Testimony Is Not a Categorical Requirement for a Healthcare-Fraud Conviction and Was Not Necessary Here. .................................................. 49

4.      The Fraudulent Medicare Claims Submitted as Part of the Conspiracy Were Foreseeable to Mesquias and McInnis. .................................................. 51

5.      The Defendants' Convictions Do Not Violate the First Amendment. .................................................. 54

II.     The District Court Did Not Clearly Err at Sentencing. ........................... 55

A.      Background .................................................................. 55

B.      Standard of Review ....................................................... 57

C.      The District Court Correctly Determined that the Loss Exceeded $65 Million. ....................................................... 58

1.      Because the Trial Evidence Established Pervasive Fraud in the Merida Group's Medicare Claims, the Totality of Those Claims Represented the Intended Loss. .................................................................. 58

2.      A Random, Representative Sample Is Not a Prerequisite for a Reasonable Loss Estimate at Sentencing. .................................................................. 64

3.      The District Court's Use of an Actual-Loss Figure Well Below the Totality of Submitted Claims Benefited the Defendants. ........................................ 66

D.      The District Court Correctly Assessed $120 Million in Restitution. .................................................................. 67

CONCLUSION .................................................................. 68

CERTIFICATE OF COMPLIANCE .................................................................. x

CERTIFICATE OF SERVICE .................................................................. xi

ADDENDUM .................................................................. xii

# TABLE OF AUTHORITIES

## Cases

*United States* v. *Anderson*,
755 F.3d 782 (5th Cir. 2014) ........................................................ 62

*United States* v. *AseraCare, Inc.*,
938 F.3d 1278 (11th Cir. 2019) ............................................46, 47, 49

*United States* v. *Ballard*,
322 U.S. 78 (1944) ..................................................................... 55

*United States* v. *Barnes*,
979 F.3d 283 (5th Cir. 2020) ........................................................ 58

*United States* v. *Barton*,
845 F.3d 159 (5th Cir. 2016) ........................................................ 53

*United States* v. *Care Alternatives*,
952 F.3d 89 (3d Cir. 2020) ........................................................... 43

*United States* v. *Danhach*,
815 F.3d 228 (5th Cir. 2016) ........................................................ 54

*United States* v. *Davis*,
735 F.3d 194 (5th Cir. 2013) ........................................................ 27

*United States* v. *Dickerson*,
909 F.3d 118 (5th Cir. 2018) ........................................................ 58

*United States* v. *Dillman*,
15 F.3d 384 (5th Cir. 1994)......................................................41, 44

*United States* v. *Ezukanma*,
756 F. App'x 360 (5th Cir. 2018) .................................................. 60

*United States* v. *Ganji*,
880 F.3d 760 (5th Cir. 2018) ........................................................ 54

*United States* v. *Harris*,
960 F.3d 689 (5th Cir. 2020) ........................................................ 50

*United States* v. *Hebron,*
 684 F.3d 554 (5th Cir. 2012) ....................................................... 59, 61, 62, 65

*United States* v. *Isiwele,*
 635 F.3d 196 (5th Cir. 2011) ................................................................. 57, 58

*United States* v. *Jones,*
 475 F.3d 701 (5th Cir. 2007) ........................................................................ 64

*United States* v. *Jones,*
 641 F.3d 706 (6th Cir. 2011) ........................................................................ 64

*United States* v. *Klein,*
 543 F.3d 206 (5th Cir. 2008) ................................................................. 57, 58

*United States* v. *Kolodesh,*
 787 F.3d 224 (3d Cir. 2015) ......................................................................... 64

*United States* v. *Mazkouri,*
 945 F.3d 293 (5th Cir. 2019) ............................................................ 59, 63, 66

*United States* v. *Moran,*
 778 F.3d 942 (11th Cir. 2015) ................................................................. 52, 53

*United States* v. *Nora,*
 988 F.3d 823 (5th Cir. 2021) ........................................................................ 53

*United States* v. *Olis,*
 429 F.3d 540 (5th Cir. 2005) ........................................................................ 57

*United States* v. *Paulus,*
 894 F.3d 267 (6th Cir. 2018) ................................................................. 43, 49

*United States* v. *Richards,*
 755 F.3d 269 (5th Cir. 2014) ........................................................................ 55

*United States* v. *Sanjar,*
 876 F.3d 725 (5th Cir. 2017) ................................................... 50, 51, 52, 54

*United States* v. *Simmons,*
 420 F. App'x 414 (5th Cir. 2011) ................................................................ 65

*United States* v. *Stalnaker*,
   571 F.3d 428 (5th Cir. 2009) ........................................................ 24

*United States* v. *Umawa Oke Imo*,
   739 F.3d 226 (5th Cir. 2014) ........................................................ 52

*United States* v. *Valdez*,
   726 F.3d 684 (5th Cir. 2013) ........................................................ 58

*United States* v. *Vargas-Ocampo*,
   747 F.3d 299 (5th Cir. 2014) (en banc) ....................................... 27

*United States* v. *Veasey*,
   843 F. App'x 555 (5th Cir. 2021) ................................................. 46

*United States* v. *Velasquez*,
   881 F.3d 314 (5th Cir. 2018) ........................................................ 45

*United States* v. *Willett*,
   751 F.3d 335 (5th Cir. 2014) ................................................. 28, 52

*United States* v. *Williams*,
   993 F.3d 976 (5th Cir. 2021) ........................................................ 67

*United States* v. *Winkler*,
   639 F.3d 692 (5th Cir. 2011) ........................................................ 27

*United States ex rel. Wall* v. *Vista Hospice Care, Inc.*,
   No. 3:07-CV-604, 2016 WL 3449833 (N.D. Tex. June 20, 2016) ........... 48

## Statutes

18 U.S.C. § 2 ...................................................................................... 28

18 U.S.C. § 371 ................................................................................... 3

18 U.S.C. § 1001 ................................................................................. 3

18 U.S.C. § 1347 ............................................................................ 3, 28

18 U.S.C. § 1349 ................................................................................. 2

18 U.S.C. § 1512 ...................................................................................................... 3

18 U.S.C. § 1518 ...................................................................................................... 3

18 U.S.C. § 1956 ...................................................................................................... 3

18 U.S.C. § 3231 ...................................................................................................... 2

18 U.S.C. § 3742 ...................................................................................................... 2

28 U.S.C. § 1291 ...................................................................................................... 2

42 U.S.C. § 1395f ................................................................................................ 4, 44

42 U.S.C. § 1395x .................................................................................................... 4

**Other Authorities**

79 Fed. Reg. 50452 (Aug. 22, 2014) ....................................................................... 5

U.S.S.G. § 2B1.1 ................................................................................. 58, 64, 66, 67

U.S.S.G. § 5E1.1 ................................................................................................... 67

**INTRODUCTION**

Over the course of a three-week trial, 15 doctors, nurses, patients, and former employees of the defendants' company testified that Rodney Mesquias and Henry McInnis engaged in an extensive scheme to defraud Medicare by enrolling thousands of patients in lucrative home-health and hospice services notwithstanding that the patients were neither homebound nor terminally ill. The evidence showed that the defendants enforced a blanket rule to enroll all patients, regardless of whether they qualified for services; circumvented patients' primary-care physicians; directed the routine falsification of medical records; instructed marketers to misrepresent eligibility criteria; and coerced, punished, and terminated doctors and nurses who would not accede to the fraud. On that record, a jury convicted them of numerous crimes, and the district court sentenced them to lengthy terms of confinement.

Neither defendant meaningfully controverts any of that evidence on appeal. Instead, both Mesquias and McInnis argue that the government's overwhelming proof of knowing and deliberate healthcare fraud is insufficient to support their healthcare-fraud convictions, principally on the theory that the representations underlying those counts were matters of unfalsifiable opinion. Their contention—which would effectively immunize even the most brazen scam so long as it was cloaked in the veneer of a professional opinion—finds no support in precedent or logic. Equally unavailing is their attempt to escape the sentencing consequences of the $124 million they gleaned from pervasively fraudulent Medicare claims. This Court should affirm.

1

## STATEMENT OF JURISDICTION

Mesquias and McInnis appeal from final judgments of conviction and sentence in a criminal case. The district court (Olvera, J.) had jurisdiction under 18 U.S.C. § 3231. The court entered judgment as to Mesquias on December 30, 2020, ROA.1230-1236, and he filed a notice of appeal on December 22, 2020, ROA.1219-1220. The court entered judgment as to McInnis on February 26, 2021, ROA.119703-119709, and he filed a notice of appeal on February 12, 2021, ROA.119699-119700. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1.     Whether sufficient evidence supported the jury's determination that the defendants committed healthcare fraud.

2.     Whether the district court's assessment of a $120-million loss for purposes of sentencing and restitution represented a reasonable estimate of the loss attributable to the defendants' healthcare-fraud scheme.

## STATEMENT OF THE CASE

### I.   Procedural History

In October 2018, a grand jury in the Southern District of Texas indicted Mesquias, McInnis, Jose Garza, Jesus Virlar, and Francisco Pena in a 12-count superseding indictment. ROA.275-306. The indictment charged the defendants with one count of conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 1349 (Count 1), ROA.282-286; six substantive counts of healthcare fraud, in violation of 18

U.S.C. § 1347 (Counts 2-7), ROA.287-288; and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 8), ROA.289-292. Pena was separately charged with one count of obstructing a criminal investigation, in violation of 18 U.S.C. § 1518 (Count 9), ROA.293-296; and one count of making a false statement, in violation of 18 U.S.C. § 1001 (Count 10), ROA.297. Mesquias, McInnis, and Virlar were separately charged with one count of conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k) (Count 11). ROA.298-299. And Mesquias, Virlar, and Pena were separately charged with one count of conspiracy to pay and receive kickbacks, in violation of 18 U.S.C. § 371 (Count 12). ROA.300-303.

Garza and Virlar pleaded guilty, pursuant to plea agreements, to the healthcare-fraud conspiracy alleged in Count 1. ROA.869, 4966-4967. Mesquias, McInnis, and Pena proceeded to trial, which lasted 12 days and featured testimony from 19 government witnesses. At the close of the government's case, each of the three defendants rested without calling any witnesses. ROA.6334-6337. The jury returned guilty verdicts on all counts. ROA.6952-6954.

Pena died before sentencing. *See* ROA.7580. The court sentenced Mesquias to 240 months in prison, to be followed by three years of supervised release, ROA.1230-1236; and McInnis to 180 months in prison, to be followed by three years of supervised release, ROA.119703-119709. The court also held Mesquias responsible for $120 million in restitution to Medicare. ROA.1235.

## II.    Statement of Facts

### A.    Medicare's Hospice and Home-Health Benefits

As explained by witness Laurie McMillan,[2] "Medicare is our federal government's health care system" that provides benefits to "people 65 years and older" and to certain disabled persons.  ROA.1344.  "Medicare is funded by all of us" through "taxes [that] are set aside in a Medicare trust fund."  ROA.1344.  Among the taxpayer-funded benefits covered by Medicare are hospice and home-health services.

"Hospice is an approach to care that is holistic, and it takes into consideration that the beneficiary is dying.  And when the beneficiary chooses to go on to hospice, they are switching the focus of their care from a curative focus to . . . comfort care."  ROA.1374.  For a hospice claim to be eligible for Medicare reimbursement, the patient's primary-care physician and the medical director of the hospice provider must "each certify in writing . . . that the individual is terminally ill . . . based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness."  42 U.S.C. § 1395f(7)(A).  "Terminally ill" means that the patient "has a medical prognosis that [his] life expectancy is 6 months or less."  42 U.S.C. § 1395x(dd)(3)(A); *accord* ROA.1376-1377 (expert testimony explaining hospice eligibility).  Medicare has "recognized the challenges in prognostication" and consequently expects only that

---

[2] The defendants' scheme—and their resulting trial—involved dozens of coconspirators, witnesses, victims, and other relevant actors.  For the Court's convenience, an alphabetical list of witnesses and parties is included in the addendum to this brief.  *See infra* pp. xiii-xiv.

"certifying physicians will use their best clinical judgment . . . to determine if the individual has a life expectancy of six months or less with each certification and recertification." 79 Fed. Reg. 50452, 50470 (Aug. 22, 2014). In addition to "be[ing] certified as terminally ill," the patient must "sign an election form" consenting to hospice, ROA.1376, which "acknowledge[s] that they understand that the care now is going to shift from a curative nature to palliative," ROA.1380.

Home-health services are covered only if the patient is "homebound"—meaning that she is "confined to the home"—and has a need for skilled nursing care. ROA.1368-1369. A person is considered "homebound" (1) if she "require[s] an assistive device, special transportation, the assistance of another person," or it is "medically contraindicated for [her] to leave the home"; and (2) if it is "a taxing effort to leave home," such that the person "ha[s] a normal inability to leave [her] home." ROA.1369. Patients seeking home-health coverage through Medicare must "be certified by a physician who is caring for [them] and certifies that [they are] homebound and . . . have a skilled need and signs the plan of care." ROA.1368.

For either benefit, Medicare operates as a "trust-based system," in which providers' claims are paid automatically in the interest of expediting reimbursement. ROA.1363-1364. But "before . . . submit[ting] a claim," providers are required "to have all the [Medicare-required] documentation complete" in order "to support that service that's being billed." ROA.1366. Additionally, when submitting claims, providers must attest that they "will not knowingly present or cause to be presented a false or fraudulent

claim for payment by Medicare" and "will not submit claims with deliberate ignorance or reckless disregard for their truth or falsity." ROA.1350.

### B.    The Merida Group's Medicare Fraud

Mesquias was the owner and chief officer of a sprawling network of hospice and home-health providers that fell under the collective umbrella of "the Merida Group," over which McInnis—Mesquias's "second in command"—exercised day-to-day operational control.  ROA.1503, 5583-5585.  From 2009 to 2018, Mesquias and McInnis worked together to build the Merida Group into a massive enterprise spanning the State of Texas and purporting to treat more than 9,000 patients, for whom they submitted more than 47,000 hospice- and home-health-related claims to Medicare, seeking over $152 million in payment and receiving about $124 million.  ROA.7581. But, as demonstrated at trial, the company's enormous census of Medicare beneficiaries was built on, maintained by, and rife with fraud.

### 1.    The Vast Majority of the Merida Group's Patients Did Not Qualify for Hospice or Home-Health Services.

According to former Merida Group employees, the overwhelming majority of the company's hospice and home-health patients did not meet Medicare requirements because they were not terminally ill or homebound, respectively.  Amber Kelso, a nurse formerly employed by the Merida Group, estimated that "80 to 85 percent of the patients that were on service" did not meet Medicare requirements, and it was not "a close call"—"they definitely didn't qualify."  ROA.2093.  Melissa Hernandez, another

ex-Merida Group nurse, estimated that "75 percent, 80 percent" of the company's hospice patients "did not qualify for hospice." ROA.3289. Roland Aguilera, formerly a Merida Group director of nursing, recalled that he attempted—but was not allowed—to discharge "[a]bout 75 percent" of patients, noting that "[t]here were patients on [hospice] for numerous years" who did not qualify. ROA.5734-5736. Jose Garza, alternate administrator at Merida Group headquarters, said that "[a]bout 70 percent" of patients did not qualify for services—and, in fact, he "remember[ed] more patients that are alive than died throughout [his] time working there under hospice." ROA.5630. Eduardo Carrillo, a former Merida Group medical director, estimated that, "[o]f the hundreds of patients that [he] saw," "more than 80 percent . . . did not qualify for hospice." ROA.2795-2796. Commenting on home-health patients, Carrillo stated that "most of these patients, all these patients, were not homebound." ROA.2791.

At the direction of Mesquias and McInnis, the Merida Group employed a range of techniques to perpetuate and conceal the fraud. Medical directors were bribed to falsely certify unqualified patients for services. *See infra* pp. 8-9. Objecting primary-care physicians were cut out of the certification process. *See infra* pp. 9-10. Doctors and nurses were told to invent and embellish patients' conditions to support fraudulent diagnoses. *See infra* pp. 11-12. Medical records were falsified to appear as if unqualified patients met Medicare requirements. *See infra* pp. 12-13. And vulnerable persons were deceived into believing that they (or their loved ones) were appropriate candidates to switch from curative treatment to palliative care under hospice. *See infra* pp. 13-14.

### 2. The Merida Group Bribed Medical Directors to Rubberstamp Unqualified Patients for Services.

Medical directors played a critical role in filling the Merida Group's census with unqualified patients. Former Merida Group marketer Ernesto Gonzalez testified that "95 percent of [hospice-referral orders] came from the medical directors themselves" rather than from patients' primary-care physicians—sometimes after "a primary care physician was consulted and refused to sign the order because the patient was not dying." ROA.1543. Indeed, Carrillo testified that it was not his "job as a medical director for the Merida Group to give an honest medical opinion" or "to make an honest diagnosis of patients," but instead "to sign and certify patients for hospice" regardless of their qualification. ROA.2771. Where the patient was not terminally ill, Mesquias and McInnis directed Carrillo to select false diagnoses from a list to make it appear that the patient qualified. ROA.2768-2770. Jesus Virlar, another former Merida Group medical director, admitted that he knowingly "sign[ed] up patients who were not dying for hospice" and "sign[ed] up patients who were not homebound for home health." ROA.4974. Both Carrillo and Virlar testified that the fraudulent certification of non-terminal patients was pervasive at the company: Carrillo "observ[ed] doctor's orders from other doctors that were also false," ROA.3237; and Virlar witnessed the fraud at every Merida Group location throughout Texas, ROA.4984-4985, and identified other medical directors who falsely certified patients for the company's hospice services, ROA.5004-5007.

By contrast, medical directors who refused to sign off on unqualified patients were pushed out of the company.  Ricardo Escamilla, for example, testified that he was pressured to keep unqualified patients on hospice and was warned that Mesquias "was not going to like" it if patients were discharged.  ROA.4532-4533.  When Escamilla insisted that unqualified patients be discharged, he discovered that the patients were instead "being changed to other doctors" and "were still staying on services."  ROA.4533-4534; *see also* ROA.2724-2725 (Belinda Gonzalez recalling an incident in which Escamilla decided to discharge an unqualified patient, but the patient "was immediately readmitted to Merida" under Virlar).  Eventually, Mesquias slashed Escamilla's compensation and orchestrated his departure.  ROA.4538-4539.

The Merida Group's reliance on pliant medical directors allowed it to overcome a major hurdle in the Medicare regulatory scheme: sign-off from a patient's primary-care physician.  As noted above, Medicare requires the primary-care physician to certify that a patient qualifies for hospice.  *See* ROA.1382-1383.  At the Merida Group, however, it was common for patients to be placed on hospice without the knowledge or assent of the patient's primary-care physician.  *See* ROA.2607 (Belinda Gonzalez "recall[ed] receiving phone calls . . . from very upset physicians asking who gave the order to put their patient on hospice, and why the patient was signed on . . . hospice without their consent or knowledge."); ROA.5532-5537 (Gabriel Gonzalez, primary-care physician for patient P.C., testifying that he never certified P.C. as terminally ill and was "surprised" to learn that the Merida Group had enrolled her without his approval).

The Merida Group also circumvented primary-care physicians who affirmatively objected to hospice care for their patients. Kelso recounted an instance in which a patient's doctor "called the office and notified the management team that he wanted [his patient] removed—discharged from [hospice] services." ROA.2124. In response, Mesquias stated that "he didn't care what the primary care physician wanted[,] the patient wasn't coming off of services." ROA.2125. Kelso recalled that the primary-care physician called the Merida Group a second time, "was very upset that [his patient] still had not been taken off services," and again "demanded that he be taken off of services." ROA.2126. Mesquias reiterated "that he didn't care, he wasn't discharging the patient, that the office was not to discharge the patient." ROA.2126; *see also* ROA.3390-3391 (Eddie Zuniga, former director of operations, recounting a similar incident). When primary-care physicians refused to certify their patient for hospice, the defendants had company-affiliated medical directors sign off on the certificate of terminal illness instead. *See* ROA.5617 (Q: "Now, did you also tell Defendant Mesquias about situations where primary care physicians refused to sign an order?" Garza: "Yes." Q: "And were those frequent?" A: "Yes." Q: "And what did Defendant Mesquias say to do?" A: "He would tell me to get our medical director to sign it." Q: "What did Defendant McInnis tell you to do?" A: "The same thing."); ROA.1543-1544 (similar testimony from Ernesto Gonzalez).

10

### 3.    Merida Group Employees Routinely Fabricated and Falsified Medical Records to Perpetuate the Fraud.

Former employees testified that the Merida Group commonly submitted claims "without the necessary documentation." ROA.1568. For example, Medicare requires completion of "face-to-face" forms by a physician before a provider can bill for hospice and home-health services. ROA.2615. Ernesto Gonzalez recalled a medical director signing "a stack of face-to-faces and backdating these face-to-faces to show that they were actually done during that time that they should have been done." ROA.1569. "[A]fter reviewing multiple face-to-face encounters" and noticing "that the wording on each face-to-face was identical to previous [ones] for different patients," Gonzalez realized that not only were the face-to-faces delinquent, but the medical director was not even "going out to physically see these patients like he should have." ROA.1570; *see also* ROA.5826 (former home-health intake coordinator Martha Ramos testifying that, in her experience, the "face-to-face . . . along with the orders from the doctor, the diagnosis and the signature from the physician" were missing from "files at Merida"). Aguilera testified that, when the grand jury's subpoena was served on the Merida Group in this case, *all* of the requested patient files were missing required documentation, such as certificates of terminal illness and face-to-face forms. ROA.5750-5751 (recalling "a bunch of missing documentation," including that "the files for each one of the[ named] patients [were] missing CTIs and face-to-faces").

When the Merida Group did get around to producing documentation, the resulting files were "pervasive[ly]" falsified. ROA.2803. Carrillo testified that he personally falsified patient records by "sign[ing] . . . forms without . . . ever seeing the patients," "sign[ing] false doctor's orders," and "add[ing] false diagnoses" to patient files—all to "guarantee[] that the patient would continue receiving hospice services." ROA.2801-2803. When asked if it was common to see false information in patient files, Carrillo said that it was "[v]ery common, pretty much every single patient." ROA.2807-2808. Similarly, Virlar admitted that "we would falsify the clinical information in the charts so that it will look as if the patient appears sicker than they really truly are so that they would meet hospice criteria," ROA.4973-4974, and he testified that other Merida Group employees—including doctors and nurses—likewise falsified records, ROA.5025. Those accounts were corroborated by numerous other witnesses who attested to false and fabricated medical records throughout the company's patient files. *See, e.g.*, ROA.4527-4528 (Escamilla: "On paper, everybody that I was seeing qualified," but in person, "their physical condition did not match what was presented to me."); ROA.3570-3571 (Hernandez testifying that Virlar "pressure[d] [her] to falsify medical records" and "put down something that's showing [a patient]'s declining"); ROA.4246 (nurse Jose Aguilar testifying that it was "[v]ery common" to "observe false information in the patient files," including "false information about whether the patients were about to die"); ROA.5609 (Garza testifying that "Rodney [Mesquias] and Henry [McInnis]" instructed him "to create false patient records" and "provide[d] [him] with a pamphlet"

12

from which to select false diagnoses "that would reflect the patient that's dying");
ROA.3449 (nurse's aide Diana Navarro testifying that "Mesquias offer[ed] to pay [her]
to create fraudulent documents" and asked her to sign documents for patients she never
saw, attesting to time periods during which she did not work for the company).

### 4. Non-Terminal Patients Were Deceived into Enrolling in Hospice.

In addition to defrauding Medicare, the Merida Group deceived vulnerable
patients—specifically targeting "indigent patients," ROA.2115, whom the company
"recruit[ed] . . . from San Antonio housing projects" and "adult day care centers,"
ROA.5012; and non-English-speaking patients, for whom recruiters "would translate
what would be advantageous for the patient to sign up for hospice, not being truthful[,]"
ROA.5039. Virlar testified that deception was widespread at the company: "All of us
were misleading the patients. And by [all] I mean all of us, the Merida Hospice Group."
ROA.4991.

The testimony of patient J.C. illustrates the practice and impact of the deception.
As discussed *infra* pp. 39-40, J.C. was not terminally ill when she was placed on hospice.
However, in order to deceive her into enrolling, Mesquias falsely told J.C. that she
"needed to be on hospice and to have them take care of [her] because [she] was dying."
ROA.2054. Mesquias's lie proved devastating to J.C.'s quality of life:

> I cried a lot at home, I was very depressed, I didn't leave my home for
> over three months because I didn't know if I was going to wake up or
> not[.] . . . I had thoughts of suicide so that my family wouldn't have to go
> through watching me die.

ROA.2054-2055. Beyond the psychic toll exacted by a false terminal diagnosis, patients like J.C. who were duped into hospice had to forgo treatments they had been receiving, as hospice focuses exclusively on palliative care. *See* ROA.1557 (Ernesto Gonzalez: "When you go on hospice, you do waive your—your right to . . . seek any t[ype] of aggressive or curative treatment"); ROA.1560 ("[J.C.] flat out told me she didn't want hospice. . . . She was still wanting to seek a period of treatment for her disease.").

Merida Group employees also falsely told patients that they did not need to be terminally ill to receive hospice. The company's marketers "were told to tell patients and their family that because a patient is going on hospice doesn't necessarily mean that they are—reached their end of life stage, it just means that they need extra help, and the services of hospice would help them." ROA.1511. This was a plain misrepresentation of Medicare's eligibility rules. *See* ROA.1376-1377. But "[t]he minute a lot of families would hear those words, they would agree to sign their loved one up for services." ROA.1514; *see also* ROA.5587 (Garza: "I was instructed to market the hospice benefit in a way that I would tell the—the family members and patients that the patient didn't have to be dying in order for them to be in hospice.").

### C.    The Defendants' Roles in the Merida Group's Fraud

#### 1.    As Owner and Head of the Merida Group, Mesquias Masterminded the Conspiracy.

Mesquias was the owner and top officer of all the Merida Group entities spanning the State of Texas. *See* ROA.3858-3862. With help from McInnis, Mesquias

"ran the operations of the Merida Group," "made the rules," and "was in full control" of the company. ROA.5583-5584.

Trial witnesses uniformly identified Mesquias as the driving force behind the Merida Group's practice of admitting all patients to hospice or home-health, regardless of whether the patient qualified. *See, e.g.*, ROA.1504 (Q: "Did Defendant Mesquias direct you to admit patient[s] to hospice who were not dying?" Ernesto Gonzalez: "Yes." Q: "And did he direct other Merida employees to admit patients to hospice who were not dying?" A: "Yes, he did."); ROA.1504-1505 (When Gonzalez told Mesquias that a patient did not qualify for hospice, Mesquias would "get in my face and tell me not to fuck with his patients or fuck with his money."); ROA.2106 (Q: "Did you learn that Defendant Mesquias had directed that every patient referred by doctors should be admitted?" Kelso: "Yes."); ROA.3381 (Zuniga testifying that Mesquias told him "[t]hat he wanted every single referral admitted."); ROA.4527 (Q: "What were you told by other Merida employees about Defendant Mesquias'[s] attitudes towards recertifying patients?" Escamilla: "I heard that he wanted them certified at any cost."); ROA.5715 (Garza: "[Mesquias] wanted us to admit every patient and keep them as long as possible so we can make money.").

Once patients were enrolled, Mesquias refused to allow any discharges—even for those who plainly did not qualify for hospice or home-health services. ROA.2096 (Q: "What did Defendant Mesquias say when he was told the patient should be taken off hospice?" . . . Kelso: "He said don't mess with my patients, don't mess with my

money."); ROA.2626 (Belinda Gonzalez testifying that Mesquias would "raise his voice with marketers . . . about making sure that the patients don't want to come off service"); ROA.3286 (Q: "During the time you were there, did Mr. Mesquias have any views on whether patients should ever be discharged?" Hernandez: "They should never be discharged, everybody should be admitted and never discharged for whatever reason unless they died."); ROA.3383 (Q: "When you observed nurses tell Defendant Mesquias that [a] patient didn't qualify, what would happen to those nurses?" Zuniga: "He would ask us not to use that nurse anymore and to assign somebody else.").

Mesquias terminated employees who refused to go along with the fraud. For example, Garza recalled that a nurse named Jerry once refused to admit a patient who did not qualify for hospice. ROA.5600. In response, Mesquias became "upset at Jerry" and told Garza "to get a nurse out there to go admit and to let Jerry go." ROA.5600; *see also* ROA.3383 (Q: "And did Defendant Mesquias, in your presence, allow nurses to freely not admit or discharge patients?" . . . Zuniga: "No."); ROA.4894 (Q: "Did you feel pressure to keep patients on hospice who didn't need it?" Escamilla: "I did. Throughout my first months there, I also kept hearing stories about nurses and staff that were fired before if they didn't do what—as they were told.").

Mesquias ordered the Merida Group's employees to circumvent doctors who objected to hospice for their patients. *See, e.g.*, ROA.1543 (Q: "[W]hat did Rodney Mesquias tell you to do when the patient's primary care physician refused to sign an order?" Ernesto Gonzalez: "Give it to the medical director so, then, that way, they can

sign off on the order."); ROA.2126 (Kelso: "[T]he primary care physician demanded that [his patient] be taken off of services, and Mr. Mesquias replied that he didn't care, he wasn't discharging the patient[.]"); ROA.3390 (Zuniga: "[W]e started with [primary-care physicians] and they weren't converting fast enough, they weren't signing. There was a delay or they would refuse to sign. At that point, that's when Rodney would ask—instruct us to send Dr. Virlar to give us the order.").

Indeed, instead of deferring to the genuine clinical judgment of primary-care physicians, Mesquias set up an explicit system of financial rewards for medical directors who approved hospice and home-health referrals indiscriminately—and financial punishments for those who did not. *See, e.g.*, ROA.2778 (Carrillo: "[I]t very quickly became evident to me that the more certifications I signed, the more money I would make. So I was financially motivated and incentivized to sign these certifications."); ROA.4981 (Q: "Were you paid to promote the fraud at the Merida Group?" . . . Virlar: "Oh, yes, I was. . . . [T]he more patients that I would refer, the bigger [my] quarterly bonus."); ROA.4538-4539 (Escamilla testifying that Mesquias withheld his medical-director pay when Escamilla refused to certify unqualified patients and "said that if I didn't refer any patients to him, he couldn't afford to pay me."); ROA.1552 (Ernesto Gonzalez: "I had called Rodney Mesquias to voice my concern on why he was terminating Dr. Escamilla, because Dr. Escamilla was a very—he was a very good doctor when it came to hospice care. I was told that Dr. Escamilla was not referring patients to the agency, so that's why he was being terminated.").

17

Former Merida Group employees admitted that, to support the resulting fraudulent certifications, they falsified medical records at Mesquias's direction. *See, e.g.*, ROA.2764 (Carrillo admitting to "falsify[ing] patient files for the Merida Group . . . [a]t the direction of Rodney Mesquias and Henry McInnis"); ROA.3398 (Q: "Did [Mesquias] want staff to use the correct diagnosis, or the one that would make the most money?" Zuniga: "The one that would make the bigger reimbursement."); ROA.3449 (Navarro testifying that "Mesquias offer[ed] to pay [her] to create fraudulent documents"); ROA.4985-4988 (Virlar recalling having spent multiple days in the Harlingen office creating "about two boxes" of falsified medical records at Mesquias and McInnis's direction); ROA.5022-5023 (Mesquias agreed to pay Virlar $5,000 to create false medical records in response to the grand jury's subpoena).

Finally, Mesquias was a principal proponent of the Merida Group's marketing strategy of lying to patients and families about hospice eligibility. *See, e.g.*, ROA.1512-1513 (Q: "And did Defendant Mesquias tell you to tell patients that they didn't need to be dying to be on hospice?" Ernesto Gonzalez: "Yes, he did." Q: "And were you present when Defendant Mesquias told other marketers to tell that to patients?" A: "Yes, I was."); ROA.3376 (Zuniga: "[W]henever there was a marketer that couldn't convert the patient, [Mesquias] would ask why and that's when he would tell the marketer that . . . they did not have to be dying within six months to be on hospice."); ROA.5587 (Q: "Who told you to tell patients that they didn't need to be dying to be on hospice?" Garza: "I was told by Rodney [Mesquias] and Henry [McInnis].").

## 2. As Mesquias's Right-Hand Man, McInnis Enforced the Policies and Practices that Sustained the Conspiracy.

McInnis's role in the fraud was succinctly described by admitted coconspirator Garza: "Rodney [Mesquias] gave the directives and the orders on how to run the company and Henry [McInnis] carried them out."  ROA.5583.

McInnis oversaw the Merida Group's day-to-day operations.  *See, e.g.*, ROA.2224 (Belinda Gonzalez: "[McInnis] was in charge of the entire operation in Harlingen," the company's "nerve center," ROA.2731); ROA.2762 (Carrillo agreeing "that Mr. Mesquias and Mr. McInnis were the leadership team at the Merida Group"); ROA.3371 (Q: "[W]ho was your boss at the Merida Group?"  Zuniga: "Rodney Mesquias and Henry McInnis."); ROA.4456-4457 (nurse Janina Gonzales: "[McInnis] was the main supervisor, the main director who ran the whole show[.] . . . [I]t was Henry who was giving all of the directions."); ROA.5818-5819 (Q: "Who was in charge of operations?"  Ramos: "Henry McInnis. . . . [H]e was the administrator for the Harlingen office and he did the daily operations," including "home health department[ and] hospice department" in Harlingen and "the other facilities they had.").

Like Mesquias, McInnis actively directed Merida Group employees to admit all referrals and recertify all existing patients, regardless of whether the patient qualified for hospice or home-health services.  Aguilera testified that, after reviewing the census, he concluded that 75% of the patients did not qualify for hospice and should be discharged.  *See* ROA.5734-5736.  When Aguilera raised his concerns, however,

McInnis did not permit him to discharge the unqualified patients. ROA.5735-5736. Aguilera further testified that, despite McInnis having no medical training, he "was in charge . . . of which patients would be admitted" and "which patients would be discharged." ROA.5736-5737. Numerous witnesses corroborated Aguilera's assessment of McInnis's role and conduct. *See, e.g.*, ROA.2764 (Carrillo admitting to "sign[ing] up patients for hospice who were not dying" at the direction of "Henry McInnis and Rodney Mesquias"); ROA.3386 (Q: "What instructions did [McInnis] give you?" Zuniga: "The—the same ones, you know, need to make sure we admitted the patient."); ROA.4983 (Virlar admitting that he "signed up patients who did not qualify for hospice" and "qualified [patients] for home health fraudulently" at the direction of "Rodney Mesquias and Henry McInnis").

Several former employees confirmed that McInnis aggressively enforced the Merida Group's fraudulent policies as devised by Mesquias. Ernesto Gonzalez testified:

Q: And what was Defendant McInnis'[s] role in enforcing Defendant Mesquias'[s] rules?

A: It was the same thing, admit patients whether or not they qualified or not.

Q: Did Defendant McInnis fire employees if they wouldn't admit patients?

A: Yes, he would.

Q: Did he threaten to fire employees if they wouldn't admit patients?

A: Yes, he would.

ROA.1508; *see also* ROA.5596-5597 (Q: "How did Defendant McInnis react if not every referral was admitted into hospice?"  Garza: "He would get upset . . . [and] yell at the staff[.]"); ROA.5820-5822 (Ramos: McInnis "cuss[ed] out" a nursing director for questioning whether a patient qualified for home-health and told nurses "you are already aware that you're not supposed to be questioning the specific referrals that come for the specific doctors [*i.e.*, Merida medical directors], you're supposed to admit.").

McInnis likewise effectuated Mesquias's directive that employees falsify patient records to conceal the fact that Merida Group patients did not qualify for services. Gonzales recounted one meeting at which McInnis instructed nurses to fabricate symptoms in order to portray patients as declining, telling them: "[Patients are] expected to die in six months or less according to, you know, the rules and regulations of hospice so y'all need to be marking that they are—they have poor appetite."  ROA.4459.  Her account is consistent with Garza's testimony that McInnis provided nurses with a pamphlet of symptoms to use in faking disease progression:

> Q:  Now, did Defendant McInnis also talk about documenting the decline?
>
> A:  Yes.
>
> Q:  And can you explain to the jury what he said?
>
> A:  He would tell me to instruct the nurses to use the pamphlet and document, make their note according to whatever the pamphlet reflected as far as, you know, a decline in their disease process so that we can admit them or we can recertify them.
>
> Q:  Did Mr. McInnis know what the patient's disease process was when he was telling you this?

A:  No.

Q:  Did it matter what their actual disease process was?

A:  No.

ROA.5610; *see also, e.g.*, ROA.2612-2617 (Belinda Gonzalez: "Harlingen," which was under McInnis's direction, directed nurses to (1) "change[] [patients] from one diagnosis to the next without evidence of a doctor changing the diagnosis, or a history and physical that indicated that patient had the diagnosis," and (2) ensure that patient notes had "the same plan of care, they had to have pain as one of them, they had to have definitely constipation as one of them, that every patient should have at least three to four of the same plans of care no matter what.").

McInnis even acknowledged to the Merida Group's employees that the purpose of falsely documenting declination in non-declining patients was to throw off auditors and investigators: "[H]e said auditor[s] look at it and we need to show that we're—that we have evidence that the patient is declining." ROA.4460.  Indeed, McInnis was aware that the falsified records were being used to conceal the submission of fraudulent claims to Medicare, as he told Garza that the records were "needed . . . for billing," and thus the "false documents [were] created to obstruct accurate audits."  ROA.5613-5614.

McInnis was also an integral part of the engine that powered the fraud— kickbacks to medical directors.  When Carrillo completed his initial evaluation of a group of 30 hospice patients, he concluded that some of the patients did not qualify. ROA.5618-5619.  In response, McInnis "told [Carrillo] that he wasn't going to get paid

for the ones that were not going to be recertified." ROA.5619. McInnis instructed Carrillo that "all he really had to do" as a medical director "was go visit them and get them to sign the paperwork." ROA.5620. From that point on, Carrillo never failed to certify a patient. ROA.2773. Ernesto Gonzalez testified that McInnis also directed payments to Pena in explicit exchange for unqualified patient referrals and recertifications, deciding that "it was cheaper to just pay out Dr. Pena for his medical directorship than to lose these patients off services." *See* ROA.1545-1546.

In conjunction with paying off medical directors, McInnis instructed employees to ignore primary-care physicians who objected to placing their patients on hospice. *See* ROA.3391-3392 (Q: "[D]id you discuss with [McInnis] instances where the primary care physician would refuse to sign the order of admission?" Zuniga: "Yes." Q: "And what did Defendant McInnis say to do?" A: "To use Dr. Virlar."); ROA.5617 (Garza testifying that McInnis, like Mesquias, "would tell me to get our medical director to sign" off on a patient on the "frequent" occasions "where primary care physicians refused to sign an order.").

Finally, McInnis told other employees to lie to patients about the requirements of hospice. *See* ROA.1513 (Q: "And what would Defendant McInnis say if a marketer came to him and said, 'Patient doesn't want to sign up. They're not dying'?" Ernesto Gonzalez: "The same thing. Go back out there and convince the family or the patient to, you know, sign up for services." Q: "Did Defendant McInnis also agree with Defendant Mesquias that you should tell patients that they didn't need to be dying to

23

be on hospice?"  A: "Yes."); ROA.3377 (Q: "What would Defendant McInnis say to you about how hospice was marketed?"  Zuniga: "That they didn't have to be dying to be on six months to offer, you know, the medications, the equipment, the supplies."); ROA.5587 (Q: "[W]hat did Henry McInnis say about [the marketing strategy]?"  Garza: "That a patient doesn't have to be dying to be in hospice.").

## III.    Rulings Under Review

Mesquias and McInnis challenge their convictions for healthcare fraud (Counts 2-7), ROA. 6952-6954, and the district court's denial of their motions for judgments of acquittal on those charges, ROA.1145-1146, 6221, 6357.[3]  They also challenge the loss calculation at sentencing.  ROA.7027-7028, 7045, 119803.

---

[3] The defendants do not appear to challenge their remaining convictions.  In his summary-of-argument section, Mesquias asserts (Br. 9-10) that "[t]he Government failed to present sufficient evidence upon which a rational jury could convict for health care fraud or infer the existence of a conspiratorial agreement to defraud, obstruct, launder money or pay kickbacks," but his brief proceeds to address only the evidence supporting his healthcare-fraud convictions on Counts 2-7—not any of the conspiracy counts.  Similarly, McInnis mentions (Br. 35) that his convictions for "conspiracy to commit Medicare fraud (Count 1), conspiracy to launder proceeds of Medicare fraud (Count 8); and conspiracy to produce false records of Medicare claims (Count 11)" were "predicated on fraud," but he neither asks the Court to review the sufficiency of the evidence for those counts nor offers any basis to set them aside.  To the extent these isolated comments constitute cursory requests for relief, they should be denied.  *See* *United States* v. *Stalnaker*, 571 F.3d 428, 439-440 (5th Cir. 2009) (Where a defendant "does not fully explain [his claims] and . . . does not cite the record or relevant law, . . . the matters are waived for inadequate briefing.").

## SUMMARY OF ARGUMENT

I.      Abundant evidence established the defendants' culpability for healthcare fraud, and the district court correctly declined to displace the jury's verdicts to that effect.  Over a dozen former Merida Group employees recounted—consistently and without rebuttal testimony—that Mesquias and McInnis directed the indiscriminate admission of unqualified patients to hospice and home-health services, the pervasive falsification of medical records, the payment of kickbacks to medical directors, the misrepresentation of eligibility criteria to patients, and the submission of false claims to Medicare.  Exemplifying the conspiracy's conduct, every one of the substantive healthcare-fraud counts was supported not only by documentary evidence demonstrating the patient's inconsistency with Medicare's hospice-eligibility standards but also, notably, by the trial testimony of admitted coconspirators that they had falsely certified the patient for services, falsely documented his medical condition in the supporting records, or both.

Instead of confronting that evidence, the defendants contend that prognoses underlying benefit-eligibility certifications are matters of opinion that are definitionally unfalsifiable—or, at least, unfalsifiable without expert testimony.  But even statements cloaked in the garb of professional opinion can be "false" when, for instance, they do not represent an exercise of genuine clinical judgment and were not honestly held by their maker.  The testimony by percipient witnesses to knowing and deliberate fraudulent conduct—including the sworn admissions to such conduct by Merida Group

certifiers themselves—was more than adequate to permit a rational juror to conclude that the Medicare claims submitted as part of the defendants' conspiracy were knowingly and deliberately falsified.

II.    The district court did not clearly err at sentencing.  In cases where the fraud is so pervasive as to render it impracticable to distinguish between legitimate and illegitimate claims, the total amount billed to Medicare presumptively serves as the intended loss, subject to a rebuttal showing by the defendants as to specific non-fraudulent claims.  Here, the district court correctly found the Merida Group's Medicare claims pervasively fraudulent on the basis of trial testimony establishing that the overwhelming majority of the company's patients did not qualify for services and that its records were extensively falsified.  On appeal, the defendants have neither contested that determination nor identified particular legitimate claims to be deducted from the loss amount.  Instead, they argue that the loss estimate was unreliable because the substantive healthcare-fraud counts of which they were convicted do not constitute a random sample of the Merida Group's claims.  But the government has never contended otherwise, and neither this Court's precedents nor the Sentencing Guidelines categorically require such a statistical analysis at sentencing.  Accordingly, the district court's use of the Merida Group's total receipts from Medicare during the period of the conspiracy appropriately informed both the sentences and the restitution order.

# ARGUMENT

## I.     Sufficient Evidence Supported the Jury's Verdicts.

### A.     Background

At the close of the government's case-in-chief, both Mesquias (ROA.6209-6214) and McInnis (ROA.6214-6215) made oral motions for judgments of acquittal, which the district court denied, ROA.6221.  After the defendants rested without calling any witnesses, Mesquias (ROA.6345-6349) and McInnis (ROA.6349-6350) reiterated their acquittal motions, which the court again denied, ROA.6357.  Following the jury's guilty verdicts, Mesquias (ROA.1011-1030) and McInnis (ROA. 119623-119640) filed written acquittal motions, which the court denied, ROA.1145-1146.  The district court's determination that sufficient evidence supported the defendants' convictions was correct, and no basis exists for this Court to unsettle the jury's verdicts.

### B.     Standard of Review

"A challenge to the sufficiency of evidence following a proper motion for acquittal is reviewed by this [C]ourt *de novo*." *United States* v. *Winkler*, 639 F.3d 692, 696 (5th Cir. 2011).  "Even when examined *de novo*, 'review of the sufficiency of the evidence is highly deferential to the verdict.'" *United States* v. *Davis*, 735 F.3d 194, 198 (5th Cir. 2013).  "[R]eviewing courts must affirm a conviction if, after viewing the evidence and all reasonable inferences in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States* v. *Vargas-Ocampo*, 747 F.3d 299, 301 (5th Cir. 2014) (en banc).

### C.    Ample Trial Evidence Established the Defendants' Culpability for Committing Healthcare Fraud.

Counts 2-7 charged Mesquias and McInnis with healthcare fraud, in violation of 18 U.S.C. §§ 1347 and 2.  To establish healthcare fraud, the government must "prove beyond a reasonable doubt that the defendant 'knowingly and willfully execute[d], or attempt[ed] to execute, a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.'" *United States* v. *Willett*, 751 F.3d 335, 339 (5th Cir. 2014).  Ample trial evidence supported the jury's determinations that each of the claims set forth in Counts 2-7 was submitted fraudulently and that the conspiracy directed by Mesquias and McInnis was responsible for all six counts.

### 1.    Count 2—J.H.

J.H. was on hospice services with the Merida Group for more than four years, during which time the company billed Medicare $286,149.  ROA.3237-3238.

Escamilla—the medical director who recertified J.H. for hospice services— testified unequivocally that J.H. did *not* qualify for hospice.  ROA.4535.  Escamilla explained that, as a new medical director at the Merida Group, he initially recertified J.H. "[b]ased on the information that [he] was given" but that he later "discover[ed] that the information [he] had been given about [J.H.] was false" and "refused to certify

him anymore." ROA.4535.  Specifically, Escamilla "found out that [J.H.] was much healthier than was portrayed" in his patient files.  ROA.4535.  As was typical at the Merida Group, however, Escamilla's subsequent attempt to discharge J.H. was thwarted; instead of being discharged, J.H. was "moved to a different panel" and certified by another Merida Group medical director.  ROA.4536.[4]

The medical director who recertified J.H. after Escamilla refused was admitted coconspirator Virlar.  ROA.4592.  At trial, Virlar testified that he "sign[ed] a false hospice order for [J.H.]," which included "unspecified debility, . . . a typical false diagnosis that [he] would use in the Merida Group patient files."  ROA.5061; *see also* ROA.5061 (explaining that "[i]t's a broad, non-specific term, again, easy to facilitate fraud.").  Virlar further testified that, "[w]hen [he] stated that [J.H.] had less than six months to live back in 2013," that was "a complete lie."  ROA.5062.  Contrary to the "physician note" that Virlar placed in the patient file, J.H. did not have "end[-]stage Alzheimer's disease" or any other terminal condition.  ROA.5062.  Indeed, J.H. continued on hospice services for over four years.  ROA.4536.

On appeal, Mesquias points out (Br. 25) that another doctor—Vincent Gonzaba—also signed certain of J.H.'s certification papers.  Of course, the fact that

---

[4] Mesquias argues (Br. 35-36) that Escamilla's testimony is irrelevant because he treated J.H. the year after the fraudulent period (August to October 2013) alleged for Count 2 in the indictment.  But the fact that J.H. was not likely to die within six months of Escamilla's certification in December 2014 permits a rational inference that J.H. was *also* not likely to die within six months of the earlier certification in August 2013.

one signatory on a Medicare form may not have acted with fraudulent intent does not defeat admissions from two others that they certified the patient falsely. *See infra* pp. 44-46. But in any event, a rational jury could have inferred that Gonzaba's certification was likewise fraudulent—particularly given the testimony from multiple witnesses that Gonzaba was perpetrating fraud alongside the Merida Group. *See, e.g.*, ROA.4262-4264 (Aguilar testifying that "Gonzaba [was] also involved in the fraud" and recounting Gonzaba and Mesquias haggling over kickbacks when Gonzaba "felt that Rodney was cheating him out from more money for those patients"); ROA.4973 (Virlar testifying that he "agreed to health care fraud with . . . clinicians that were part of [his] group," including "Vicente Gonzaba"); ROA.5003 (Q: "Was Dr. Gonzaba involved in the fraud?" Virlar: "Yes, he was."); ROA.5004 ("[Gonzaba] would refer patients from the Gonzaba Clinics and also fraudulently document diagnoses that did not meet hospice criteria, or symptoms that were not true of patients.").[5]

### 2.    Count 3—F.P.

F.P. was on hospice services with the Merida Group for nearly three years, during which time the company billed Medicare $196,582. *See* ROA.3233-3234.

---

[5] Mesquias also contends (Br. 31) that Kelso's testimony about J.H. "expressly exonerates [him]." The portion of her testimony on which he relies relates to J.H.'s having recorded a functional-assessment score of 7B (indicating severe dementia) on a single day. ROA.2219. But Mesquias omits Kelso's testimony that "just because he reaches a 7B level at one point in time doesn't mean he can't improve from that, he has to stay at that level consistently or decline" to be eligible for hospice. ROA.2217. Indeed, Kelso expressly *disagreed* with the conclusion "[t]hat [J.H.] was permanently eligible for hospice" based on that score. ROA.2219.

Virlar, who treated F.P. during the time he was medical director for the Merida Group, testified that F.P. was not terminally ill. ROA.5051-5052 (Q: "[F.P.] qualified for hospice at that time?" A: "She did not."). Both Virlar and Carrillo described for the jury how they falsified and fabricated medical records for F.P. Virlar testified to completing and signing a fraudulent certification of terminal illness in which he documented that F.P. had terminal-stage chronic respiratory failure and Alzheimer's—both of which, Virlar later admitted, were false. ROA.5056-5057 (Q: "Dr. Virlar, is this an order that you signed?" A: "Yes, it is. It's [a] certification narrative stating that fraudulently she qualifies for hospice by saying that she has chronic respiratory failure, which she did not; by saying that she has terminal Alzheimer's, which she did not." Q: "Okay. So you falsified that order?" A: "Yes, I did."). Carrillo, who also "certif[ied] that [F.P.] had six months or less to live in 2014," ROA.2794, likewise admitted that he "fraudulently signed up [F.P.] for service," ROA.3233-3234, and asserted that F.P.'s medical records could not be trusted due to the fraud, ROA.3236-3237.

Mesquias argues (Br. 37-38) that—notwithstanding Virlar's and Carrillo's admissions that they fraudulently certified F.P. for hospice—the government's evidence is deficient because another physician also signed certain of F.P.'s certification forms. That physician was Francisco Pena, an indicted coconspirator of Mesquias and McInnis, ROA.282, who was found guilty of six counts arising from the Merida Group's fraud, ROA.6953-6954. Over the course of the trial, the jury heard extensive testimony that Pena knowingly certified unqualified patients for the purpose of obtaining illegal

kickbacks without exercising his genuine clinical judgment. *See, e.g.*, ROA.4973 (Q: "[W]ho, if anyone in the medical profession, did you agree to commit health care fraud with?" Virlar: "With Dr. Francisco Pena."); ROA.4977 (Virlar: "Dr. Francisco Pena's role was similar to mine, as a medical director to recruit patients, place patients in hospice and keep them in hospice so that their revenue of the company grows."); ROA.1547 (Q: "And what did Defendant Pena say he would do with his patients if he didn't get paid?" Ernesto Gonzalez: "He was going to take his patients off services."); ROA.4268-4269 (Aguilar testifying that, at the required interdisciplinary-team meetings for hospice patients, Pena's "routine was, just give me what I have to sign, and he'd sign off, and it was—it was all business and money and business, money, schemes and things of that nature. . . . [I]t wasn't patient care"); ROA.3833 (Q: "Did you ask Francisco Pena if he follows [the six-month-life-expectancy] Medicare requirement?" Special Agent Williams: "Yes." Q: "What was his response?" A: "He said he doesn't believe in that rule so he doesn't go by it.").

Unsurprisingly, Pena's certification of F.P. bore similar indicia of fraud. Pena referred F.P. to hospice based on a diagnosis of chronic respiratory failure. ROA.5052. But records from the nursing home that cared for F.P. during that period reflected no such diagnosis—despite the fact that "a nursing home typically record[s] serious diagnoses for patients" and "chronic respiratory failure [is] a terminal diagnosis." ROA.5052-5053. In fact, Pena's own documentation demonstrated that F.P. was *not* suffering from chronic respiratory failure. ROA.5054 (Q: "[W]hat doctor participated

in this meeting?  Virlar: "Dr. Francisco Pena."  Q: "And does it indicate here that [F.P.'s] breathing is fine?"  A: "Yes, it's at a greater than 98 percent.  Normal.").  Pena later swapped one fraudulent diagnosis for another, changing F.P.'s primary diagnosis from respiratory failure to "Alzheimer's disease unspecified"—a diagnosis that was frequently employed as part of the fraud because, according to Virlar, "[i]t is a broad enough term where it allows us to easily cover the fraud."  ROA.5054-5055.  Like F.P.'s respiratory-failure diagnosis, the Alzheimer's diagnosis was inconsistent with Pena's own medical records, which described F.P. as "alert, oriented."  ROA.5055-5056.

Finally, F.P.'s history confirms that she was nowhere near terminally ill when certified as hospice-eligible.  Pena signed the first certification of terminal illness for F.P. in September 2013, attesting that her disease process was at a stage such that she was expected to die within six months.  ROA.3775.  But Special Agent Williams visited F.P. at her nursing home in July 2017—nearly four years later—and found her still alive on hospice.  ROA.3776-3777.  Williams further testified that, in July 2019—nearly six years after F.P. was certified as likely to die within six months—he visited F.P. again at her nursing home, where she was still living, had not experienced a visible decline since 2017, and had been taken off of hospice care.  ROA.3777-3779.

### 3.    Count 4—T.C.

T.C. was on hospice with the Merida Group for three years, during which time the company billed Medicare $202,012.  ROA.3239-3240.

Virlar treated T.C. during the time he was a medical director for the Merida Group. ROA.5026. Based on that experience, Virlar testified that T.C. was not terminally ill and did not qualify for hospice. ROA.5027 (Q: "Was [T.C.] terminally ill at that time?" A: "No, she was not." Q: "Was she qualified for hospice at that time?" A: "No, she did not."). Nevertheless, Virlar admitted that, at the direction of the defendants, he falsely certified T.C. as terminally ill. ROA.5028 (Q: "[D]uring that timeframe, did you certify that [T.C.] was hospice qualified?" A: "Yes, I did, fraudulently." Q: "Was it true or false?" A: "It was false." Q: "At whose direction?" A: "Rodney Mesquias and Mr. Henry McInnis."). Virlar recounted that he falsely diagnosed T.C. with chronic obstructive pulmonary disease (COPD); stated that she was "short of breath at rest, [when] she was not"; wrote that she "[u]ses nebulizers," which "[s]he did not"; and represented that she had "[m]inimal activity with generalized weakness," when in fact "she was active." ROA.5028. In sum, Virlar testified that his certification of terminal illness for T.C. was "[c]ompletely false": "[t]he patient did not have severe COPD" and "did not have a terminal illness" at all. ROA.5029; *see also* ROA.5030 (noting that T.C.'s medical records indicated that "[s]he's breathing completely normal" and was not "taking any medications at this time for COPD").

Notwithstanding Virlar's admission, Mesquias contends (Br. 38-39) that the Merida Group's hospice claims for T.C. were legitimated by two other certifying physicians—Gonzaba and Patricia Arizaca. Again, the fact that some signatory may have concluded that a patient qualified for services does not negate the conceded falsity

of another certifier's representations. But in any event, as discussed *supra* pp. 29-30, Gonzaba was implicated by multiple witnesses as a coconspirator in the defendants' fraud. And Arizaca—who was employed by the Gonzaba Medical Group—requested that the Merida Group "do Hospice Eval and Admission" for T.C. without offering any supporting prognosis. ROA.22213. Moreover, another Merida Group record for T.C. during the same period identified her primary hospice diagnosis as congestive heart failure, which Virlar testified to be both "false" and contrary to Arizaca's "list of diagnoses" for her patient. ROA.5030-5031.

Indeed, the Merida Group's own records reflected a determination that T.C. was "not appropriate for hospice" and was ordered to be discharged from Merida Group subsidiary Professional Hospice Care on September 11, 2014—the day before she was placed on hospice with a different Merida Group entity. ROA.3351-3354. Instead of discharging T.C., the company transferred her—with Virlar's approval—to Merida Group subsidiary Bee Caring Hospice. ROA.3353-3355; *see also* ROA.3354 (Q: "So a patient that didn't qualify for hospice was discharged on September 11th, 2014?" Hernandez: "Yes, sir." Q: "On September 12th, 2014 she started with another Rodney Mesquias company?" A: "Yes, sir.").

### 4. Count 5—A.C.

A.C. was on hospice services with the Merida Group for 2.5 years, during which time the company billed Medicare $142,525. ROA.3242.

Merida Group employees who had the opportunity to regularly observe A.C. testified consistently that he was not terminally ill and did not qualify for hospice. For example, Hernandez saw A.C. at his apartment every week and recalled that he was "a pretty active man" who "drove himself everywhere." ROA.3355. Based on their many interactions, Hernandez believed that A.C. "did not qualify" for hospice. ROA.3356.

That conclusion was shared by Virlar, who also had firsthand contact with A.C. and determined that he was not terminally ill and did not qualify for hospice. ROA.5034. Virlar admitted that he falsified and fabricated patient records for A.C., including a physician order dated June 3, 2014, which reflected a diagnosis of congestive heart failure and notations that A.C. needed help walking and used oxygen—none of which were true. ROA.5035-5036 (Q: "What diagnosis is indicated here?" A: "CHF, congestive heart failure, unspecified." Q: "Was that true or false?" A: "That was false."); ROA.5036 (Q: "Mr. Virlar, are these your notes?" A: "Yes, they are." Q: "Are they true or false?" A: "They're false.").

Once again, Mesquias erroneously asserts (Br. 39-41) that the fact that other doctors "at various times also certified [A.C.] for [hospice]" should overcome the admissions by Merida Group employees that they certified the patient fraudulently. Multiple of the doctors whom Mesquias cites as having certified A.C. were themselves implicated in misconduct through testimony. *See, e.g.*, ROA.2620-2622, 5003-5004 (discussing role of Gonzaba Medical Group in the fraud); ROA.3307 (Hernandez: "[Chandrahasan] never paid attention to us when we were in [interdisciplinary-team

meetings].”); ROA.5006-5007 (Virlar: “[Zartuche] would fraudulently, again, sign up patients via writing that they were sicker than they appeared, adding symptoms, adding physical exam findings.”).  And the patient's own records contradicted the hospice diagnosis: A.C.'s primary-care physician, Arizaca, did not list congestive heart failure on his medical history or list of diagnoses, ROA.5037, and her notes described A.C.'s cardiac condition as “regular rhythm and rate, no significant murmurs, no significant congestive heart failure findings,” ROA.5038.

### 5.    Count 6—P.C.

P.C. was on hospice services with the Merida Group for 3.5 years, during which time the company billed Medicare $275,558.  ROA.3241.

Notwithstanding Medicare's requirement that a patient's primary-care physician approve her hospice referral, P.C.'s primary-care physician of 14 years, Gabriel Gonzalez, testified that he never approved P.C. for hospice because she “never fit the criteria for hospice.”  ROA.5235; *see also* ROA.5236 (“[S]he never had any illness where I expected her to die within six months.”).  Gonzalez testified that he was duped into allowing the Merida Group to “evaluate” P.C. for hospice: upon receiving a letter from the company, he agreed to the evaluation because he thought that perhaps P.C.'s health had declined since their last appointment.  ROA.5237-5238 (“I did not know what had happened to [P.C.], that maybe she had been admitted to another hospital, that something critical might have happened to her.”).  But when Gonzalez saw P.C. for her next visit, there had been no such adverse health event: “she seemed to be the same as

[the] last time I had seen her." ROA.5253. Indeed, Gonzalez never received any results of the "evaluation," nor was he ever contacted by the Merida Group about placing P.C. on services. ROA.5238-5239. He did not learn until years later, when he was contacted by an investigator, that P.C. had been placed on hospice. ROA.5239-5240.

Numerous other witnesses confirmed that P.C. did not qualify for hospice. Virlar, who treated P.C. between February and April 2016, testified that she was not terminally ill at the time and did not qualify for hospice. ROA.5057. Carrillo—who signed P.C.'s hospice order, *see* ROA.5058—testified that he would not trust the information concerning P.C. in the Merida Group's files "because [he] was falsely certifying patients and falsely . . . [w]riting out diagnoses," ROA.3241. Garza recalled nurses telling him that P.C. did not qualify for hospice and should be discharged, but she was kept on services "[t]o make money." ROA.5631-5632. And Aguilar recounted how a nurse who documented visits with P.C., Fidencio Salinas, was "the guy who did the dirty work . . . if no nurse would recertify that patient because the patient didn't qualify"—"he's going to be the guy that's just going to make up all the documentation that's required . . . to make it look on paper like that they need it." ROA.4266-4267.

Mesquias, again, invokes (Br. 41-46) the attestations of other signatories that P.C. was hospice-eligible but, again, fails to grapple with the admissions from her Merida Group certifiers that they acted fraudulently in obtaining her benefits. And, contrary to his assertion (Br. 45-46) that "there is no evidence or even in[n]uendo [that the certifying physicians] acted fraudulently," the doctors on whose word Mesquias relies—

principally, Pelly and Posada—were implicated by other witnesses in the defendants' fraud. *See* ROA.3247-3248 (Carrillo recalling Pelly telling him, "Eat what you kill," meaning "that the more patients that you see, the more patients that you eat or kill, the more money you make."); ROA.5002 (Q: "Was Dr. Posada also involved in the fraud?" Virlar: "Yeah, yes, he was.").

### 6.    Count 7—J.C.

J.C. was on hospice services with the Merida Group for 1.5 years, during which time the company billed Medicare $94,576. *See* ROA.3238, 7622.

The hospice claim underlying Count 7 was fraudulent for two reasons. First, like other beneficiaries, J.C. was not terminally ill and did not qualify for hospice services. *See* ROA.5064-5065 (Q: "And [did J.C.] qualif[y] for hospice at that time?" Virlar: "No, she did not."). Virlar admitted that he signed false hospice orders for J.C., ROA.5065, and Carrillo admitted that he signed a false certificate of terminal illness for her, ROA.2806-2807, 3238. Ernesto Gonzalez testified that, when another physician wanted to discharge J.C., Mesquias "put her under Dr. Virlar's oversight," and Virlar continued to write orders certifying J.C. for hospice. ROA.1563.

Second, J.C. did not consent to hospice services—a core Medicare requirement for benefit eligibility. *See* ROA.1379. In her testimony at trial, (a very-much-alive) J.C. made clear that she did not consent to hospice care when enrolled five years prior. *See* ROA.2053 (Q: "Why didn't you want to stay on hospice?" A: "Because I felt that I could stay on my own, do things on my own and that I really didn't need to be, you

know, monitored or watched."). But J.C. felt that she was given no choice, testifying that she "was a hostage to [Mesquias], that I was tied down, I had to stay with him, I couldn't say—I couldn't get off, he wouldn't let me." ROA.2056. J.C.'s lack of consent was corroborated by Ernesto Gonzalez, who testified that J.C. "flat out told [him] she didn't want hospice" because "[s]he was still wanting to seek a period of treatment for her disease." ROA.1560. On appeal, the defendants neither address nor attempt to rebut J.C.'s uncontroverted testimony that she did not consent to hospice.

### D.    The Defendants' Contention that They Cannot Be Convicted on the Basis of Opinions as to Benefit Eligibility Both Misrepresents the Record and Misapprehends the Law.

Neither Mesquias nor McInnis meaningfully controverts the extensive evidence adduced at trial and summarized above. Instead, both defendants argue that testimony that they engaged in a deliberate scheme to defraud Medicare is immaterial to their convictions for healthcare fraud because the government did not make a threshold showing that any of the prognoses reflected in the substantive counts was objectively false. *See* Mesquias Br. 24; McInnis Br. 23. Their contention both misstates the facts and misapprehends the law.

### 1.    The Trial Evidence Established that the Merida Group's Medicare Claims Did Not Truthfully Reflect the Certifying Physicians' Clinical Judgment.

This Court has held that "[a] statement or representation is 'false' or 'fraudulent'" when "it is known to be untrue or is made with reckless indifference to its truth or falsity; and is made or caused to be made with intent to defraud." *United States* v.

*Dillman*, 15 F.3d 384, 392 (5th Cir. 1994); *cf.* ROA.6500-6501 (substantively identical jury instruction). Based on (1) the evidence that the patients named in the substantive counts were not terminally ill when certified as such, (2) the sworn admissions by testifying coconspirators that they fraudulently certified those same patients and falsified their supporting documentation, and (3) the extensive testimony establishing the Merida Group's pervasively fraudulent practices, the jury reasonably inferred that the representations underlying the substantive counts were "known to be untrue" or, at minimum, "made with reckless indifference as to [their] truth or falsity."

  a. To begin, the trial evidence established that the prognoses reflected in the substantive counts were plainly untrue. As discussed *supra* p. 4, Medicare restricts hospice eligibility to patients whose life expectancy is six months or less. The patients named in the substantive counts spent many multiples of that period on hospice care. Indeed, even the shortest hospice stint in the substantive counts—J.C.'s comparatively modest year and a half—represented only a fraction of the five years J.C. had lived, by the time of trial, following her initial hospice certification in 2014. *See supra* pp. 39-40. Half a decade after she had been "given a diagnosis of having a few months to live" by Virlar, ROA.2052, J.C. was not only alive but able to take the witness stand, offering compelling evidence that the Merida Group's determinations of hospice eligibility were flagrantly false. *See also* ROA.1388 (McMillan testifying that "the length of stay for the [Merida Group], far out—far surpassed six months," which was "a red flag").

But the government's proof went beyond showing that particular prognoses turned out to be "objectively" wrong and, in fact, demonstrated that the certifying physicians were not truthfully exercising their clinical judgment when evaluating patients. Virlar—who admitted to fraudulently certifying for hospice and/or falsifying the supporting medical records of the patients named in Counts 2, 3, 4, 5, and 7, *see supra* pp. 29-36, 39—acknowledged that he "sign[ed] up patients who were not dying for hospice," "sign[ed] up patients who were not homebound for home health," "cause[d] false claims to be submitted to Medicare," "manufacture[d] fake records that were sent to the Grand Jury," and "receive[d] kickbacks in exchange for patient referrals." ROA.4974-4975. Virlar was unvarnished about his motives, testifying that he was not "paid to give a truthful medical opinion" but instead "was paid to bring patients into the Merida Group, basically evaluate patients and document what was necessary to fit that patient to meet hospice criteria." ROA.4980; *see also* ROA.4981-4982 (Q: "As a medical director with the Merida Group, were you paid to give a truthful prognosis for patients?" A: "No, I was not." Q: "Were you paid to give a truthful diagnosis?" A: "No, I was not."). Carrillo—who admitted to fraudulently certifying for hospice and/or falsifying the supporting medical records of the patients named in Counts 3, 6, and 7, *see supra* pp. 31, 38-39—likewise acknowledged that he "falsif[ied] patient files," "sign[ed] up patients for hospice who were not dying," "sign[ed] up patients for home health who were not homebound," and "refer[red] patients to the Merida Group in exchange for kickbacks." ROA.2764-2765. Carrillo, too, was blunt

about his motivation, admitting to having knowingly "falsified . . . doctor's orders" because "Mesquias withheld [his] check as a medical director" if he did not.  ROA.2789.

That the medical directors' admittedly fraudulent representations were provided in the guise of medical opinion is immaterial to criminal liability, as "opinions are not, and have never been, completely insulated from scrutiny.  At the very least, opinions may trigger liability for fraud when they are not honestly held by their maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion." *United States* v. *Paulus*, 894 F.3d 267, 275 (6th Cir. 2018); *see also United States* v. *Care Alternatives*, 952 F.3d 89, 98 (3d Cir. 2020) ("[M]edical opinions may be 'false,'" and "whether the defendant was acting in good faith or committing fraud . . . was an appropriate question for the jury."); *cf.* Mesquias Br. 11 ("A properly formed and *sincerely held* clinical judgment is not false even if a different physician later contends that the judgment is wrong." (emphasis added)).  As they conceded at trial, the Merida Group's medical directors did not "honestly h[o]ld" their stated opinions as to the eligibility of the patients named in Counts 2-7—thus rendering their representations fraudulent.

At minimum, by demonstrating that Merida Group certifiers were motivated by their own pecuniary interests rather than any concern for the truthfulness of their prognoses, the government met its burden as to falsity as this Court has defined it.  To show that a claim was "false" or "fraudulent" within the meaning of the healthcare-fraud statute, the government did not have to objectively disprove the underlying prognosis—although, as noted *supra* p. 41, it easily cleared that bar here.  Rather, the

government needed only to adduce sufficient evidence from which a rational juror could conclude that the claim reflected a fraudulent motive untethered to the certifying physician's clinical judgment—in other words, "reckless indifference to its truth or falsity." *Dillman*, 15 F.3d at 392. In this case, the trial evidence—including the sworn admissions of certifying physicians themselves—conclusively demonstrated that the claims identified in Counts 2-7 were motivated by the system of corrupt financial incentives erected by the defendants rather than any genuine clinical judgment.

**b.**    The defendants do not address the medical directors' admissions to having deliberately falsified the certifications and diagnoses of the patients named in the substantive healthcare-fraud counts. Instead, they argue that the fact that certain other physicians signed certain other documents attesting to those patients' eligibility renders the government's evidence insufficient. That contention fails for three reasons.

First, the possibility that one certifier was exercising his clinical judgment does not cancel out the admission that another certifier was not. As testified by the government's expert, Medicare requires that an "initial certification for terminal illness [be] signed by the hospice medical director and the patient's primary care physician or attending physician." ROA.1382-1383; *see also* 42 U.S.C. § 1395f(7)(A). If either of those parties signs fraudulently, then the claim itself is, necessarily, fraudulent.

Second, even assuming that the good faith of other doctors is relevant to these counts, the jury could rationally have concluded that those signatories were operating under the same set of corrupt incentives as the testifying medical directors. Multiple

witnesses implicated non-testifying physicians—and, principally, those affiliated with the Gonzaba Medical Group—in the defendants' fraud. *See, e.g.*, ROA.5002-5008 (Virlar confirming that Posada, Gonzaba, and Zertuche, among other doctors, were involved in the fraud); ROA.4262 (Aguilar confirming that Gonzaba was involved in the fraud); ROA.2620-2622 (Belinda Gonzalez describing unusual overlap in employees between Gonzaba Group and Merida Group and testifying that she had never "experienced a dual employee of the hospice company and a medical practice" before); ROA.6953-6954 (jury finding Pena guilty of numerous counts related to the fraud). Although the defendants promised at the outset of trial that jurors were "going hear from Dr. Gonzaba," who "stands by his clinical judgment," ROA.1303, that testimony never materialized. It is certainly "within the sole province of the jury as the fact finder" to favor "the credibility of [testifying] witnesses" when "choos[ing] among reasonable constructions of evidence." *United States* v. *Velasquez*, 881 F.3d 314, 328 (5th Cir. 2018). Moreover, an inference that all certifying parties knew the representations underlying the company's claims to be false is consistent with (1) the trial evidence that numerous patients' diagnoses were contradicted by other information in their patient files and (2) the undisputed fact that each of the purportedly terminal patients named in Counts 2-7 lived for many years after they were certified as likely to die within six months.

Third, the defendants have sketched out, at most, a legitimate contest between competing inferences for the jurors to resolve—the existence of which does not compel the conclusion that the evidence was insufficient to sustain their resolution of that

dispute. Indeed, this Court recently relied on the jury's role as ultimate factfinder and arbiter of credibility to reject an argument almost identical to the defendants':

> Stiger asserts that the testimony from nurses who worked at Apple that Stiger overruled their decisions on whether to admit patients to home health care or discharge them, at most, shows a simple disagreement. However, this is essentially Stiger arguing that the jury should have believed her theory over the government's theory. That does not establish insufficiency of the evidence.

*United States* v. *Veasey*, 843 F. App'x 555, 564 (5th Cir. 2021). Both Mesquias and McInnis were permitted to (and did) advance their exculpatory theory that the claims underlying the substantive counts were not false because they reflected physicians' genuine clinical judgment. *See, e.g.*, ROA.1308-1309. The government combatted this contention with its own inculpatory theory. *See, e.g.*, ROA.6524 ("[J.C] wasn't on hospice because of a mistaken prognosis, [J.C.] wasn't on hospice because hospice is an inexact science. [J.C.] was on hospice because of fraud, plain and simple."). That the jury credited the government's theory over the defense theory does not establish the insufficiency of the evidence.

### 2. The Defendants' Cited Case Law Does Not Undermine the Jury's Falsity Determination.

**a.** Throughout his brief, Mesquias repeatedly invokes the Eleventh Circuit's decision in *United States* v. *AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019), but the evidentiary avenue rejected in that case bears no relation to the one pursued by the government in this one. In *AseraCare* (a civil action arising under the False Claims Act), the government staked its case primarily on "several days of testimony from Dr. Liao,

who explained that, in his expert opinion, the medical records of the patients at issue did not support AseraCare's 'terminal illness' certifications because they did not reveal a life expectancy of six months or less." *Id.* at 1287. Notably, "Dr. Liao made clear that his testimony was a reflection of only his own clinical judgment based on his after-the-fact review of the supporting documentation." *Ibid.* In deeming that evidence insufficient to carry the government's burden, the Eleventh Circuit held "that a clinical judgment of terminal illness warranting hospice benefits under Medicare cannot be deemed false, for purposes of the False Claims Act, when there is only a reasonable disagreement between medical experts as to the accuracy of that conclusion, *with no other evidence to prove the falsity of the assessment.*" *Id.* at 1281 (emphasis added).

Two critical distinctions render *AseraCare* inapposite here. First, unlike the expert in *AseraCare*—who concededly conducted only an "after-the-fact review of the supporting documentation," 938 F.3d at 1287—the trial testimony in this case came from percipient witnesses who attested either to their own deliberately fraudulent conduct or to such conduct that they observed, contemporaneously, from colleagues. Second, unlike the government's case in *AseraCare*—in which, the Eleventh Circuit noted, "[t]here were no allegations . . . that certifications or medical documentation were forged, or that AseraCare employees lied to certifying physicians or withheld critical information regarding patient conditions" and "no doubt in the proceeding below that AseraCare possessed accurate and comprehensive documentation of each patient's medical condition," *id.* at 1285—the trial record in this case featured robust

evidence demonstrating the fraudulence of the defendants' enterprise, the unreliability of its records, and the pervasive falsity of its Medicare claims. Accordingly, the significant "other evidence to prove the falsity of the assessment" lacking in *AseraCare* but adduced below deprives that decision of any relevance here.

**b.** McInnis principally relies (Br. 33) on an unreported order—*United States ex rel. Wall* v. *Vista Hospice Care, Inc.*, No. 3:07-CV-604, 2016 WL 3449833 (N.D. Tex. June 20, 2016)—for the proposition that, to carry its burden, "the Government must have proven at minimum that each certification was not simply wrong but obviously and objectively false." Like *AseraCare*, *Wall* is not helpful to the defendants.

In *Wall*, the district court determined that, to prove a violation of the False Claims Act, "a relator could present evidence that a certifying physician was not, in fact, exercising the physician's clinical judgment when certifying a patient, because the physician never reviewed the patient's medical condition nor saw the patient, or that the physician did not actually believe that if the patient's disease ran its normal course, the patient had a prognosis of six months or less." 2016 WL 3449833, at *17. As discussed *supra* pp. 42-26, that is precisely the type of contemporaneous-intent evidence the government offered against the defendants here. By contrast, the problem with Wall's evidence, per the district court, was that after-the-fact expert testimony "says nothing about whether physicians certified patients without exercising their own clinical judgment or without finding patients to be terminally ill." 2016 WL 3449833, at *17. But again, the trial testimony in *this* case came from percipient witnesses who attested

to deliberately fraudulent conduct they either committed or observed.  Accordingly, to the extent *Wall* bears any relevance here, it supports the government's approach.

### 3.    Expert Testimony Is Not a Categorical Requirement for a Healthcare-Fraud Conviction and Was Not Necessary Here.

Despite relying on two cases—*AseraCare* and *Wall*—that explicitly *rejected* after-the-fact expert testimony as a means of proving that medical prognoses were false, the defendants contend that expert testimony is, in fact, the *only* way for the government to prove the fraudulence of a Medicare claim based on a hospice-eligibility certification. *See* Mesquias Br. 26; McInnis Br. 14.  That argument is wrong twice over: even a prognosis deemed to be objectively erroneous by a reviewing expert was not necessarily criminally fraudulent, nor does criminal fraudulence require a threshold determination of objective error or unreasonableness.  *See supra* pp. 40-41.

Instead, the incorrectness or unreasonableness of a diagnosis has been used, in appropriate circumstances, as a basis from which the jury might infer the requisite knowledge and intent to support fraud liability.  *See, e.g.*, *AseraCare*, 938 F.3d at 1300 (favorably citing a case in which "the Government's expert testimony was sufficient to support an inference that the defendant had lied when he reported readings of the angiograms that the experts said were simply not true" (citing *Paulus*, 894 F.3d at 276)).  But that inferential sequence is unnecessary in this case, where direct witness testimony—including admissions by coconspirators that they fraudulently certified patients and falsified records—established the falsity of the Medicare claims.  The

defendants appear to argue that the government erred by relying too heavily on direct evidence of the conspiracy's fraudulent acts and not adducing sufficient circumstantial evidence from which the jury could merely infer fraudulence. But the weighing of equally probative types of evidence is a task for the jury, not this Court. *See United States* v. *Harris*, 960 F.3d 689, 693 (5th Cir. 2020) ("Juries are 'free to choose among all reasonable constructions of the evidence,' and '[d]irect and circumstantial evidence are given equal weight.'"). Accordingly, in similar circumstances, this Court has expressly rejected "a categorical rule that expert testimony is required for a jury finding of medical necessity." *United States* v. *Sanjar*, 876 F.3d 725, 745 (5th Cir. 2017).

Moreover, the defendants do not explain how any expert could possibly have rendered an after-the-fact assessment of diagnostic reasonableness where the Merida Group lacked reliable documentation on patients' medical conditions. As discussed in detail *infra* pp. 60-61, the trial testimony established that the company's records were pervasively falsified. In these circumstances, the government reasonably elected to elicit testimony from eyewitnesses who could recount the fraudulent acts they observed (and committed) rather than elicit testimony from an uninvolved party who could render only hypothetical judgments on the basis of fictitious medical records. The defendants offer no basis to deem that approach impermissible.

### 4.   The Fraudulent Medicare Claims Submitted as Part of the Conspiracy Were Foreseeable to Mesquias and McInnis.

Mesquias additionally argues that the jury lacked evidence that he knew of the fraudulent representations underlying the substantive counts. *See* Br. 35 ("There is no evidence that Mesquias was involved in any way with the certification of [J.H.] or that he knew [J.H.]'s claim was submitted."); 38, 39, 41, 42, 50 (similar assertions as to the other named patients).  That contention fails for two reasons.

**a.**   First, Mesquias's assertion cannot be squared with the consistent testimony that both defendants were intimately involved in the operations of the Merida Group and explicitly directed the falsification of claims and records throughout the fraudulent period.  *See, e.g.,* ROA.2768 (Q: "[B]ased on your discussions with Rodney Mesquias[ and] Henry McInnis, . . . were they all aware this information was false?"  Carrillo: "Yes."); *see generally supra* pp. 14-24.  Like the defendant in *Sanjar, supra,* the evidence showed that Mesquias was the head honcho at the company, directing "employees [to] falsify patient files to comport with [Medicare] requirements," issuing "commands to . . . misrepresent[] the[ir] symptoms," and paying "kickbacks" to compliant doctors.   876 F.3d at 746.   McInnis, meanwhile, acted as Mesquias's enforcer—"the day-to-day manager" who "oversaw almost every significant aspect of the fraud," including "direct[ing] the admission of patients he knew to be ineligible for . . . treatment, even over complaints from other staff," and "overr[i]d[ing] staff attempts to deny admissions to [non-qualifying] patients."  *United States* v. *Moran,* 778 F.3d 942,

953 (11th Cir. 2015). That the defendants used their positions of authority at the Merida Group to compel coconspirators to make false representations (rather than always making the representations themselves) is no defense, as "[a] defendant need not have actually submitted the fraudulent documentation . . . in order to be guilty of health care fraud or conspiracy to commit health care fraud." *United States* v. *Umawa Oke Imo*, 739 F.3d 226, 235 (5th Cir. 2014).

The evidence "in this case is similar to what courts have found sufficient in other health care fraud schemes." *Sanjar*, 876 F.3d at 746 (collecting cases). Specifically, this Court has upheld healthcare-fraud convictions when managers "had employees falsify patient files to comport with [federal-program] requirements . . . and, as the owners of [the service provider], reaped substantial profits from the scheme." *Ibid.* "[L]egal owner[ship]" of a fraudulent business, however, is not required for liability: in *Willett*, for example, the evidence was sufficient to convict both the company's legal owner and her associate, who "had a position of authority in [the company]." 751 F.3d at 340-341.

Similarly, in *Moran*, *supra*—which this Court cited with approval in *Sanjar*, 876 F.3d at 746—the court of appeals upheld convictions for healthcare-fraud conspiracy and substantive healthcare fraud as to both the CEO and the "day-to-day manager" of a Medicare service provider. In affirming the former's convictions, the court noted that "[m]ultiple witnesses testified that [the CEO] was ultimately in charge," that he "delegated tasks which implemented the fraud scheme," and that "he directed the format of the false employee filing for 'case management' services." 778 F.3d at 961.

52

In affirming as to the latter, the court relied on testimony that the manager's "day-to-day management of [the company] played a key role in the conspiracy," as he "hired recruiters to find and refer patients" and "pioneered the recruitment [strategy]" that undergirded the scheme. *Ibid.* As recounted consistently by numerous witnesses, Mesquias and McInnis played similar roles here, and a rational juror could infer that both defendants were aware of the fraudulent claims their company was submitting.[6]

**b.**    Second, even setting aside the evidence that both Mesquias and McInnis were personally involved in the submission of fraudulent claims and falsification of supporting documentation, the defendants' guilt on the conspiracy count establishes their liability for each of the substantive healthcare-fraud offenses committed in furtherance of that conspiracy. *See United States* v. *Barton*, 845 F.3d 159, 165 (5th Cir. 2016) ("Because the evidence was sufficient to convict [the defendant] on the conspiracy count, the jury was entitled to convict [him] on the substantive counts as well."). There is no dispute that the Merida Group submitted the claims alleged in Counts 2-7. *See* ROA.6155-6157. As coconspirators, Mesquias and McInnis are criminally liable for the Merida Group's submission of fraudulent claims to Medicare

---

[6] McInnis cites (Br. 33-34) *United States* v. *Nora*, 988 F.3d 823 (5th Cir. 2021), in which this Court vacated convictions because "the evidence did not prove that" a clerical employee "understood [the company]'s various practices and schemes to be fraudulent or unlawful," *id.* at 831. The same cannot be said of McInnis—who, for example, instructed nurses to fabricate symptoms explicitly to make patients appear to satisfy "the rules and regulations of hospice," ROA.4459, and ordered false documentation to show "auditor[s] . . . that the patient is declining," ROA.4460.

as part of their conspiracy. *See United States* v. *Danhach*, 815 F.3d 228, 235 (5th Cir. 2016) ("Under *Pinkerton*, a conspirator can be found guilty of a substantive offense committed by a co-conspirator and in furtherance of the conspiracy, so long as the co-conspirator's acts are reasonably foreseeable."). And in the context of a healthcare-fraud conspiracy, the commission of substantive healthcare-fraud offenses is plainly foreseeable to conspirators. *Cf. Sanjar*, 876 F.3d at 744 ("In other words, how could the payment of kickbacks not be foreseeable to a participant in a kickback conspiracy?").[7] Accordingly, sufficient evidence supported the jury's verdicts, and no reason exists to set them aside.

### 5. The Defendants' Convictions Do Not Violate the First Amendment.

Finally, McInnis suggests (Br. 24-27) that his convictions are inconsistent with the First Amendment because they rested in part on "[e]nd-of-life discussions" that "warrant additional protection under the Free Expression Clause." That contention—

---

[7] The defendants briefly assert (Mesquias Br. 58; McInnis Br. 34) that *United States* v. *Ganji*, 880 F.3d 760 (5th Cir. 2018), supports their claims, but *Ganji* could not be further from this case. There, this Court found it instructive that witnesses "spoke of their own fraudulent actions, but they never testified that they agreed with Dr. Ganji or Davis to carry out these activities." *Id.* at 770; *see also id.* at 771 ("Usually, the Government presents a co-conspirator who was involved in the specific conspiracy charged. Here, no such person exists."). In this case, however, the government presented ample testimony from ex-Merida Group employees that the defendants explicitly instructed them to undertake fraudulent actions—including testimony from admitted coconspirators Carrillo, Virlar, and Garza that they falsified certifications and patient records "[a]t the direction of Rodney Mesquias and Henry McInnis." ROA.2764 (Carrillo's testimony); *see also* ROA.4973 (Virlar: "I agreed to health care fraud with my partner Rodney Mesquias[ and] my partner Henry McInnis"); ROA.5578-5579 (Q: "Who do you see in the courtroom who you conspired to commit health care fraud [with] at Merida?" Garza: "Henry McInnis and Rodney Mesquias.").

which he did not raise in any of his three acquittal motions, *see supra* p. 27—lacks merit. "'[T]he First Amendment has permitted restrictions upon the content of speech in a few limited areas,' including . . . fraud . . . and speech integral to criminal conduct." *United States* v. *Richards*, 755 F.3d 269, 273-274 (5th Cir. 2014). The "end-of-life discussions" recounted at trial were integral to the defendants' scheme to defraud Medicare by enrolling unqualified patients in hospice. *See, e.g.*, ROA.2060-2061. And McInnis's lone authority—*United States* v. *Ballard*, 322 U.S. 78 (1944), in which the Supreme Court reversed mail-fraud convictions predicated entirely on theological claims set forth in proselytizing literature—is inapposite to this case, in which the defendants directed the submission of hospice claims for patients whom they and their coconspirators knew not to be clinically qualified for those services.[8]

## II.    The District Court Did Not Clearly Err at Sentencing.

### A.    Background

The presentence investigation reports (PSRs) for Mesquias (ROA.7571-7665) and McInnis (ROA.120062-120155) reflected an intended loss of $152,731,019 (the total claims that the Merida Group submitted to Medicare) and an actual loss of

---

[8] McInnis also advances (Br. 27-31) various policy-based reasons for the government to desist from prosecuting healthcare fraud arising from hospice claims. Even assuming that policy concerns may appropriately inform a sufficiency-of-the-evidence analysis, McInnis's warning of "broad regulatory uncertainty for the health care industry" is not implicated by this case, which does not turn on a technical showing of regulatory noncompliance but instead features overwhelming evidence that the defendants knowingly and deliberately directed the submission of fraudulent claims that, by their makers' admission, did not reflect a genuine exercise of clinical judgment.

$124,213,530 (the amount the Merida Group collected from Medicare), ROA.7651, 120141. Using intended loss as the appropriate metric, the Probation Office assessed a 26-point increase for a loss exceeding $150 million. ROA.7651, 120141. Alongside other adjustments not at issue here, the loss enhancement yielded a total offense level of 50 and a Guidelines range of life imprisonment for Mesquias, ROA.7652, 7659; and a total offense level of 47 and a Guidelines range of life imprisonment for McInnis, ROA.120142, 120150.

Both defendants objected, contending that the loss, if any, should be limited to charges associated with the six named patients during the periods covered by the six substantive counts—a total of $19,895.39. ROA.7547, 119795. The Probation Office declined to revise its assessment of an intended loss exceeding $150 million; noted that, "due to the pervasiveness of the fraud at the Merida Group, it is impossible to discern fraudulent claims from legitimate claims"; and found that no reductions were warranted because the defendants had "not provided any legitimate, non-fraudulent amounts, that are included in the [loss figures]." ROA.7672.

At Mesquias's sentencing hearing, the district court sustained in part and overruled in part his objection to the loss amount, rejecting the use of intended loss based on the full amount of the Merida Group's bills to Medicare and instead "find[ing] that the damages should be no more than $150 million"—a "two points reduction" from the offense level calculated in Mesquias's PSR. ROA.7013. After hearing the remainder of his objections, the district court "adopt[ed] the PSR subject to its rulings"

and arrived at a "[S]entencing [G]uidelines range at a level 46, which would be a term of life imprisonment." ROA.7027-7028. The court then sentenced Mesquias to 240 months in prison. ROA.7041. Turning to restitution, the government suggested, "[i]n light of the Court's finding that the loss amount would be no more than 150 million," that, "as a conservative measure," restitution should "be set at 121 million"—just shy of the $124 million in Medicare payments received by the Merida Group. ROA.7044-7045. The district court "round[ed] down to 120 million even." ROA.7045.

At McInnis's sentencing hearings, the court made identical findings—ruling "that the damages will not exceed 150 million," ROA.119803, but otherwise "adopt[ing] the PSR subject to its rulings," ROA.119837—and arrived at an offense level of 45 and a Guidelines range of life imprisonment, ROA.119838. The court sentenced McInnis to 180 months in prison, ROA.119851, but waived restitution, ROA.119852.

## B.     Standard of Review

"This [C]ourt reviews a district court's factual findings at sentencing for clear error and its legal analysis de novo." *United States* v. *Olis*, 429 F.3d 540, 545 (5th Cir. 2005). Specifically, the Court "consider[s] *de novo* how the court calculated the loss, because that is an application of the guidelines, which is a question of law." *United States* v. *Klein*, 543 F.3d 206, 214 (5th Cir. 2008). "[C]lear error review applies to the background factual findings that determine whether or not a particular method is appropriate." *United States* v. *Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011). "If [this Court] affirm[s] the district court's methodology under this framework, [it] then review[s] the

application of the methodology to the facts of the particular case for clear error." *United States* v. *Barnes*, 979 F.3d 283, 311 (5th Cir. 2020).

Importing those principles to the instant case, this Court should (1) apply "clear error review . . . to the [district court's] background factual finding[]" that the claims the defendants caused the Merida Group to submit to Medicare were pervasively fraudulent, *Isiwele*, 635 F.3d at 202; (2) "consider *de novo*" the district court's resulting reliance on Medicare's payments to the Merida Group to estimate actual loss, *Klein*, 543 F.3d at 214; and (3) review the total loss amount at which the district court arrived under that methodology ($120 million) for clear error, *Barnes*, 979 F.3d at 311.

### C.    The District Court Correctly Determined that the Loss Exceeded $65 Million.

#### 1.    Because the Trial Evidence Established Pervasive Fraud in the Merida Group's Medicare Claims, the Totality of Those Claims Represented the Intended Loss.

"The Government bears the burden to establish [loss] amounts [at sentencing], at which point the burden shifts to the defendant to prove the inaccuracy of the loss calculation." *United States* v. *Dickerson*, 909 F.3d 118, 129-130 (5th Cir. 2018). "In the health care fraud context, 'the amount fraudulently billed to Medicare/Medicaid is prima facie evidence of the amount of loss [the defendant] intended to cause.'" *United States* v. *Valdez*, 726 F.3d 684, 696 (5th Cir. 2013); *accord* U.S.S.G. § 2B1.1 cmt. 3(F)(viii). Neither Mesquias nor McInnis disputes that the defendants' PSRs accurately reflected

the total amounts that the Merida Group billed to ($152,731,019) and received from ($124,213,530) Medicare during the fraudulent period (2009-2018).

"When fraud is so pervasive that separating legitimate from fraudulent conduct 'is not reasonably practicable,' 'the burden shifts to the defendant to make a showing that particular amounts are legitimate.' In the absence of such evidence from the defendant, 'the district court may reasonably treat the entire claim for benefits as intended loss.'" *United States* v. *Mazkouri*, 945 F.3d 293, 304 (5th Cir. 2019) (quoting *United States* v. *Hebron*, 684 F.3d 554, 563 (5th Cir. 2012)). That approach is sensible, as any other would allow a defendant to "reap the benefits of a lower sentence because of his ability to defraud the government to such an extent that an accurate loss calculation is not possible." *Hebron*, 684 F.3d at 563. Accordingly, under this Court's case law, the district court was permitted to adopt a total loss up to $152,731,019 as long as it did not clearly err with respect to two predicate factual propositions: (1) that the fraud at the Merida Group was "so pervasive that separating legitimate from fraudulent conduct is not reasonably practicable"; and (2) that the defendants failed to carry their burden of demonstrating that particular amounts charged to Medicare were legitimate.

### a.  The Defendants' Fraudulent Practices Pervaded Every Aspect of the Merida Group's Claims and Records.

Two aspects of the defendants' conspiracy qualify their Medicare claims as pervasively fraudulent. First, former Merida Group employees consistently testified that the company's hospice- and home-health-related claims were overwhelmingly false.

Second, every witness with firsthand knowledge of the Merida Group's records testified that those files were pervasively fabricated and unreliable.

As summarized *supra* pp. 6-7, witnesses generally estimated that between 70 and 80% of the Merida Group's patients did not meet Medicare's baseline eligibility requirements. *See, e.g.*, ROA.2093 (Kelso: 80-85%); ROA.2795-2796 (Carrillo: >80%); ROA.3289 (Hernandez: 75-80%); ROA.5630 (Garza: 70%); ROA.5736 (Aguilera: 75%); *cf.* ROA.1390 (McMillan: "[A]lmost 97 percent of [the reviewed claims] did not meet [Medicare's] conditions of payment"). As the government's accountant testified, if 70-80% of patients did not qualify for services, "[t]hat would imply that there are 8,000 patients that are being billed to Medicare that otherwise don't qualify for the services for which Medicare is paying." ROA.6201-6202. Evaluating over 47,000 claims relating to the 9,339 patients whom the company enrolled in services during the nine-year fraudulent period, ROA.7581, to identify roughly 8,000 unqualified beneficiaries is not a "reasonably practicable" means of estimating loss. *See, e.g.*, *United States* v. *Ezukanma*, 756 F. App'x 360, 373 (5th Cir. 2018) ("It is not 'reasonably practicable' to make an individual determination of the validity of the claims, as it would be inefficient, expensive, and problematic to ask the Government to review over 90,000 claims and interview 4,200 Medicare beneficiaries to establish a loss calculation.").

Indeed, that exercise would prove not only impracticable but impossible in this case due to the unreliability of the Merida Group's records. To both conceal and perpetuate their scheme, the defendants directed Merida Group employees to falsify

patient files and other documentation supporting their Medicare claims. *See supra* pp. 11-13, 18, 21-22. As a result, "pretty much every single patient" had "false information in [her] patient files." ROA.2807-2808 (Carrillo's testimony). Numerous witnesses testified that they would not trust the Merida Group's files in any respect. *See, e.g.,* ROA.3236 (Q: "[I]f you had a box of [F.P.] patient records from the Merida Group detailing conditions, good days, bad days, would you trust those records?" Carrillo: "No, I would not."); ROA.4532 (Q: "And if I gave you Merida files would you trust what is in them?" Escamilla: "I would not."); ROA.5025 (Q: "Do you have an opinion on the integrity of the Merida Group's records?" Virlar: "Zero integrity."); ROA.5614 (Q: "[I]f I showed you a box of Merida patient files, can you tell the jury whether you can trust what was in it?" Garza: "I wouldn't."). Moreover, the trial testimony reflected that Mesquias and McInnis anticipated that the company's medical records would be examined one day to verify whether patients qualified for services—and they took deliberate steps to frustrate any such review. *See, e.g.,* ROA.4460 (Gonzales: "[McInnis] said auditor[s] look at it and we need . . . evidence that the patient is declining."); ROA.5613-5614 (Garza testifying that "false documents [were] created to obstruct accurate audits"). As this Court counseled in *Hebron*, defendants should "not be able to hide behind [their] extensive fraud to escape a longer sentence." 684 F.3d at 563.

Relying on this evidence, the Probation Office correctly concluded that the defendants' Medicare claims were pervasively fraudulent. *See* ROA.7597 ("[T]he fraudulent certification of non-terminal patients was pervasive at the Merida Group.");

ROA.7598 ("The falsification of patient records was pervasive at the Merida Group.");

ROA.7672 ("[D]ue to the pervasiveness of the fraud at the Merida Group, it is

impossible to discern fraudulent claims from legitimate claims."). The district court's

adoption of those factual findings at sentencing was not clearly erroneous.

### b. The Defendants Have Not Identified Any Legitimate Claims Submitted to Medicare.

Once the government has established that the defendants engaged in pervasively

fraudulent conduct, "the burden shifts to the defendant[s] to make a showing that

particular amounts are legitimate." *Hebron*, 684 F.3d at 563. But neither Mesquias nor

McInnis has pointed to any legitimate charges for qualified beneficiaries that should

have been credited against the Merida Group's Medicare billings. They have failed to

carry their rebuttal burden or to offer any reason for this Court to unsettle the

determination below that "the defendant[s] ha[ve] not demonstrated that any of the

$152,000,000.00 in claims submitted to Medicare were legitimate." ROA.7677.

Instead of attempting to identify "particular amounts a[s] legitimate," both

defendants invoke (Mesquias Br. 7; McInnis Br. 36-37) the government's statement in

opening argument that "no one during this trial is going to take that stand and tell you

that every single claim that the Merida Group submitted contained false information,"

ROA.1290, as evidence that they cannot be held liable for the entirety of the company's

Medicare charges during the fraudulent period. But "attorneys' arguments are not

evidence," *United States* v. *Anderson*, 755 F.3d 782, 798 (5th Cir. 2014), and the

defendants cite no authority suggesting that a prosecutor's remark anticipating the type of evidence that would be adduced at trial constrains the district court's loss calculation post-verdict. In any event, this Court's pervasive-fraud doctrine is not premised on an assumption that *every* claim in a pervasively fraudulent venture was individually false, but rather a recognition that the fraud renders it infeasible for the sentencing court to parse legitimate claims from illegitimate ones. Thus, the possibility that some legitimate claims may have been intermingled in the deluge of illegitimate submissions would not preclude a finding of pervasive fraud or the resulting use of the Merida Group's Medicare receipts as the appropriate estimate of loss.

This Court's decision in *Mazkouri, supra*, is instructive. There, the Court deemed the defendant's healthcare fraud "so pervasive that separating legitimate from fraudulent conduct [wa]s not reasonably practicable." 945 F.3d at 304. In so deciding, the Court relied on "[t]he PSR's distillation of the facts" and the district court's findings to conclude "that Mazcuri conspired to commit extensive Medicare fraud from 2006 to 2012"; that he "oversaw the 'systematic manipulation' of hundreds of vulnerable patients"; and that those patients "'were fraudulently committed to inpatient treatment' . . . for no other purpose than to generate revenue." *Ibid.* Turning to rebuttal evidence, the Court was unpersuaded by Mazcuri's conclusory "argu[ment that] at least some of the money paid by Medicare was not based on fraud" and declined his invitation to "look at only the actual loss resulting from the five patients . . . involved in [the substantive counts]." *Ibid.* The same result, for the same reasons, should obtain here.

## 2.     A Random, Representative Sample Is Not a Prerequisite for a Reasonable Loss Estimate at Sentencing.

Neither Mesquias nor McInnis devotes any effort to rebutting the pertinent findings against them at sentencing—namely, that their venture was pervasively fraudulent and that they failed to carry their consequent burden of identifying particular legitimate claims. Instead, the defendants assert that the government did not adequately demonstrate that the claims underlying Counts 2-7 were randomly selected to produce a statistically representative sample. *See* Mesquias Br. 55-59; McInnis Br. 35-38. But the government has never contended that the six substantive counts were drawn from a random sample, nor is it required to adduce such statistical evidence to establish "a reasonable estimate of the loss" at sentencing. U.S.S.G. § 2B1.1 cmt. 3(C).

Echoing their argument that after-the-fact expert testimony is the sole means of adducing sufficient evidence of healthcare fraud, *see supra* pp. 49-50, the defendants appear to contend that random sampling is the only way to prove a widescale fraud at sentencing. But this Court has never imposed such a categorical rule. To the contrary, "[t]he district court receives wide latitude to determine the amount of loss and should make a reasonable estimate based on available information." *United States* v. *Jones*, 475 F.3d 701, 705 (5th Cir. 2007). "'[T]here is no rule that a district court must rely upon statistical analysis in a situation such as this to determine the amount of loss pursuant to section 2B1.1.'" *United States* v. *Kolodesh*, 787 F.3d 224, 240 (3d Cir. 2015) (quoting *United States* v. *Jones*, 641 F.3d 706, 712 (6th Cir. 2011)); *see also United States* v. *Simmons*,

420 F. App'x 414, 418 (5th Cir. 2011) (upholding tax-fraud loss calculation despite the fact "that the forty-one tax returns investigated by [the testifying agent] were not a completely random sample").

Here, the government proved pervasive fraud through an accumulation of *direct* evidence: consistent testimony by former employees that (1) the overwhelming majority of patients certified for services were ineligible, and (2) the company's patient files and other records were thoroughly unreliable. As they did in challenging their convictions, the defendants seem to argue that the government's evidentiary avenue was *too* direct— that it should have instead taken an *inferential* route, establishing a statistical probability of widespread fraud through a randomized sample of the Merida Group's claims. While that may be one available means of estimating loss, the defendants cite no authority rendering it the only permissible method. *Cf.* ROA.6181-6182 (Although "those six [counts] are not drawn from a valid statistical random sample[,] . . . [i]t doesn't mean the six can't be instructive in some way," as "there's many ways to slice an apple."). And as this Court noted in *Hebron*, the fact that a reviewing court might be able to hypothesize "alternative methods that could have yielded a more accurate calculation" does not require vacatur, because "[t]his [C]ourt need not determine whether the district court's estimate was the most reasonable, but rather only that it is a reasonable calculation." 684 F.3d at 563-564 (positing, as an alternative method of estimating loss, that "the probation officer could have requested . . . a sampling of similarly sized towns"

and extrapolated figures for the total population based on "the average amount requested" from the sample set, but declining to require that method).[9]

### 3. The District Court's Use of an Actual-Loss Figure Well Below the Totality of Submitted Claims Benefited the Defendants.

Despite being justified in holding Mesquias and McInnis accountable for the full amount of intended loss ($152,731,019), the district court cut the defendants a break by "find[ing] the total intended loss was less than $150,000,000.00." ROA.7723. That lower bracket corresponded to the actual loss identified by the Probation Office— $124,213,530—and resulted in only "a 24-level increase . . . for a loss amount of more than $65,000,000.00 but less than $150,000,000.00" rather than the 26-level increase reflected in the defendants' PSRs. ROA.7723.

To be clear, the district court ought to have used "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. 3(A). But its reliance instead on the lower actual-loss figure forecloses the defendants' remaining claims that the court detrimentally erred at sentencing. *Cf. Mazkouri*, 945 F.3d at 304 (Although "[t]he PSR calculated an intended loss of $69,512,730.25 based on the amount . . . billed to Medicare," the district court "used only the actual loss paid out by Medicare, which was $22,922,199.91. . . . Mazcuri has not shown that the district court's decision to use less than one-third of

---

[9] Mesquias also briefly complains (Br. 9, 16) that the district court "denied live witness[] testimony at the sentencing hearing," but he neither asserts that this limitation constituted an abuse of discretion nor explains how it prejudiced him. Between the three weeks of trial testimony and Mesquias's 93-page PSR, the court had a robust basis upon which to impose his sentence.

that amount resulted in an unreasonable estimate of the loss."). For example, Mesquias notes (Br. 58) that "[e]ven in [the witnesses'] 'guestimates of fraud' there is an unacknowledged 30% to 15% legitimate services provided which constitutes tens of millions of dollars." Although, again, the pervasive-fraud doctrine does not operate on a premise that every claim was individually fraudulent, *see supra* p. 63, discounting the loss by up to 30% would yield the same loss range under Section 2B1.1(b)(1)(M)— "[m]ore than $65,000,000"—that the district court ended up imposing.[10] Thus, any marginal disputes as to the loss attributable to the fraud are immaterial to the defendants' Guidelines calculations, as the court used a loss baseline ($65 million) that was less than half of the total amount the Merida Group billed to Medicare.

### D.    The District Court Correctly Assessed $120 Million in Restitution.

Finally, the district court's assessment of $120 million in restitution against Mesquias reasonably approximated the loss resulting from the conspiracy. "In the case of an identifiable victim, the court shall . . . enter a restitution order for the full amount of the victim's loss." U.S.S.G. § 5E1.1. "But unlike [other] Guidelines—under which intended losses can affect a custodial sentence"—restitution is limited "'to the *actual* loss directly and proximately caused by the defendant's offense of conviction.'" *United States* v. *Williams*, 993 F.3d 976, 980 (5th Cir. 2021).

---

[10] Intended loss discounted by 30% equals $106,911,713; actual loss discounted by 30% equals $86,949,471.

Mesquias's PSR correctly identified "Medicare" as "the victim in this case" and concluded that "[r]estitution is owed for the full amount of [actual] loss [suffered by Medicare], $124,213,530.00." ROA.7649. The district court "round[ed] down to 120 million even," ROA.7045, but otherwise adopted the PSR's findings, ROA.7027. On appeal, Mesquias does not contest the restitution order in any respect independent of his challenge to the loss calculation for sentencing purposes. Because, as discussed *supra* pp. 58-67, those objections lack merit, the restitution order was not clearly erroneous.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgments below.

Respectfully submitted,

JENNIFER B. LOWERY
   Acting United States Attorney

KENNETH A. POLITE, JR.
   Assistant Attorney General

CARMEN CASTILLO MITCHELL
   Chief, Appellate Division
   Southern District of Texas

LISA H. MILLER
   Acting Deputy Assistant Attorney General

*s/ Joshua K. Handell*

JEREMY R. SANDERS
   Appellate Counsel, Fraud Section

JOSHUA K. HANDELL
   Attorney, Appellate Section
   Criminal Division, Ste. 1515
   United States Department of Justice
   950 Pennsylvania Avenue N.W.
   Washington, DC 20530
   (202) 305-4244
   joshua.handell@usdoj.gov

October 20, 2021

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the word limitation imposed by this Court in its October 7, 2021 order (App. Dkt. No. 65) because it contains 17,498 countable words, as verified by the word-count feature of Microsoft Word 2019.

2.    This brief complies with the type-size and type-face requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it has been prepared in 14-point Garamond font.

3.    This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.50, which is continuously updated, and according to that program, is free of viruses.

*s/ Joshua K. Handell*

JOSHUA K. HANDELL
    Attorney, Appellate Section
    Criminal Division, Ste. 1515
    United States Department of Justice
    950 Pennsylvania Avenue N.W.
    Washington, DC 20530
    (202) 305-4244
    joshua.handell@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on October 20, 2021, I caused the foregoing brief to be served upon

the Filing Users identified below through the Court's CM/ECF system:

Hector Antonio Canales
Jose Antonio Canales
Canales & Simonson, P.C.
2601 Morgan Avenue
Corpus Christi, TX 78405
(361) 883-0601
hector@canaleslawoffice.com
tonycanales@canalessimonson.com

Robert Louis Guerra Jr.
Law Office of Robert Guerra, P.L.L.C.
1201 E. Van Buren
Brownsville, TX 78520
(956) 254-0694
rguerra@rguerralaw.com

*Counsel for Defendant-Appellant Rodney Mesquias*

Cooke Kelsey
Parker & Sanchez, P.L.L.C.
700 Louisiana Street
Houston, TX 77002
(713) 659-7200
cooke@parkersanchez.com

*Counsel for Defendant-Appellant Henry McInnis*

s/ Joshua K. Handell
JOSHUA K. HANDELL
   Attorney, Appellate Section
   Criminal Division, Ste. 1515
   United States Department of Justice
   950 Pennsylvania Avenue N.W.
   Washington, DC 20530
   (202) 305-4244
   joshua.handell@usdoj.gov

# ADDENDUM

## I.    Statutory Provisions

### 18 U.S.C. § 1347—Health care fraud

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

   (1) to defraud any health care benefit program; or

   (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

   in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.  If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

(b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

### 18 U.S.C. § 1349—Attempt and conspiracy

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

## II.    Regulatory Provisions

### 79 Fed. Reg. 50470—Guidance on Determining Beneficiaries' Eligibility for Hospice

An individual must be certified by the hospice medical director and the individual's attending physician (if designated by the individual) as being terminally ill, meaning that the individual has a medical prognosis of a life expectancy of 6 months or less in order to receive the Medicare hospice benefit. However, we also have recognized the challenges in prognostication.  It has always been our expectation that the certifying physicians will use their best

clinical judgment, based on the initial and updated comprehensive assessments and collaboration with the hospice interdisciplinary group (IDG) to determine if the individual has a life expectancy of six months or less with each certification and recertification.

## III.   Relevant Persons

| NAME | ROLE | TESTIMONY |
|---|---|---|
| Jose Aguilar | Registered nurse, formerly at Merida Group (ROA.4243-4244); confidential government source (ROA.3785) | ROA.4242-4451 (Day 6) |
| Roland Aguilera | Registered nurse, formerly director of nursing for Merida Group's San Antonio branch (ROA.5732-5733) | ROA.5731-5811 (Day 8) |
| Eduardo Carrillo | Former medical director at Merida Group (ROA.2753-2756) | ROA.2753-2866 ROA.3178-3275 (Days 3-4) |
| Joanne Conti | Merida Group hospice patient (ROA.2052-2053); subject of Count 7 (ROA.288) | ROA.2050-2087 (Day 2) |
| Ricardo Escamilla | Former associate medical director at Merida Group (ROA.4519-4520) | ROA.4518-4599 (Day 6) |
| Jose Garza | Former alternate administrator at Merida Group Harlingen (ROA.5576-5577); indicted coconspirator (ROA.277); pleaded guilty before trial (ROA.869) | ROA.5575-5731 (Day 8) |
| Janina Gonzales | Registered nurse, formerly care manager at Bee Caring Hospice (Merida Group) (ROA.4452-4454) | ROA.4451-4518 (Day 6) |
| Belinda Gonzalez | Registered nurse, formerly at Merida Group (ROA.2221-2224) | ROA.2221-2242 ROA.2605-2752 (Days 2-3) |
| Ernesto Gonzalez | Former marketer at Merida Group (ROA.1496) | ROA.1495-1600 ROA.1930-2049 (Days 1-2) |

| NAME | ROLE | TESTIMONY |
|------|------|-----------|
| Gabriel Gonzalez | Primary-care physician for patient P.C. (ROA.5233-5235) | ROA.5233-5256 (Day 7) |
| Melissa Hernandez | Registered nurse, formerly at Merida Group (ROA.3278-3279) | ROA.3276-3368 (Day 4) |
| Francisco Pena | Former medical director at Merida Group; indicted coconspirator (ROA.277); found guilty (ROA.6953-6954); died (ROA.7580) | Did not testify. |
| Amber Kelso | Licensed vocational nurse, formerly of Professional Hospice / Bee Caring Hospice (Merida Group) (ROA.2088-2091) | ROA.2088-2219 (Day 2) |
| Henry McInnis | Defendant-appellant; indicted coconspirator (ROA.277); found guilty (ROA.6953) | Did not testify. |
| Laurie McMillan | Certified fraud examiner (ROA.1342) and government's Medicare expert (ROA.1344) | ROA.1337-1494 (Day 1) |
| Rodney Mesquias | Defendant-appellant; indicted coconspirator (ROA.276); found guilty (ROA.6952-6953) | Did not testify. |
| Diana Navarro | Certified nurse's aide, formerly at Merida Group (ROA.3439-3440) | ROA.3438-3454 (Day 4) |
| Michael Petron | Government witness who summarized voluminous accounting data (ROA.6141) | ROA.6138-6207 (Day 9) |
| Martha Ramos | Former home-health intake coordinator at Merida Group (ROA.5816-5818) | ROA.5816-5842 (Day 8) |
| Jesus Virlar | Former medical director at Merida Group; indicted coconspirator (ROA.277); pleaded guilty before trial (ROA.4966) | ROA.4964-5232 (Day 7) |
| Neal Williams | FBI Special Agent who investigated Merida Group in the Laredo area (ROA.3770) | ROA.3761-3989 (Day 5) |
| Eddie Zuniga | Former director of operations at Merida Group (ROA.3370-3371) | ROA.3368-3438 (Day 4) |